## In re DES CASES.

Deborah ASHLEY and Andrew Ashley, Marjorie Berger, Kathy Broaddus and Kerry Wayne Broaddus, Ann Danoff and Christopher Wang, Maureen Kent and Steven Kass, Nancy Kirsch and Steven Kirsch, Carol Rosenthal and Barry Rosenthal, Eva Zweifler and Vincent Alvarado, Gail Buckman and Michael Sklaroff, Tracy Wellman and Gary R. Scandell, Robin Edwards and Frank J. Edwards, Carrie Bristol and Zeke Bristol, Karen Hinton and David Hinton, Kyle Kouzes and Steve Kouzes, Jennifer Lynch, Barbara Bilder and Daniel Waldman, Linda Montgomery and Newman Montgomery, Plaintiffs,

v.

The ABBOTT LABORATORIES, American Pharmaceutical Co., Beecham Laboratories, Boehringer Ingelheim Pharmaceuticals, Inc., Boyle & Co. Pharmaceuticals, Burroughs–Wellcome & Co., Inc., Carnrick Laboratories, Inc., previously known as G.W. Carnrick Co., Inc., Chase Chemical Co., Chromalloy American Corp., Cooper Holdings, Inc., previously known as Cooper Laboratories, Dart Industries, Inc., previously known as Rexall Drug Co., Inc., Emons Industries, Inc., Key Pharmaceuticals, Kremers–Urban Co., now known as Mequon Co., Lannett Co., Inc., Eli Lilly and Co., Lincoln Laboratories, Inc., Malinckrodt, the S.E. Massengill Co., McNeilab, Inc., Merck & Co., Inc., Merrell Dow Pharmaceuticals, Inc., Premo Pharmaceutical Laboratories, Inc., previously known as Lemmon Co. of N.J., Inc., Rite Aid Corp., Rorer Group, Inc., Rowell Laboratories, Inc., Schering Corp., Solvay Pharmaceuticals, Inc., formerly known as Reid–Provident Laboratories, Inc., Stanley Drug Products, Inc., a division of Sperti Drug Corp., E.R. Squibb & Sons, Inc., the Upjohn Company, West–Ward, Inc., now known as Industrial Way Liquidating Corp., White Laboratories Corp., Defendants.

Angela SILVERI, Plaintiff,

v.

The ABBOTT LABORATORIES, American Pharmaceutical Co., Beecham Laboratories, Boehringer Ingelheim Pharmaceuticals, Inc., Boyle & Co. Pharmaceuticals, Burroughs–Wellcome & Co., Inc., Carnrick Laboratories, Inc., previously known as G.W. Carnrick Co., Inc., Chase Chemical Co., Chromalloy American Corp., Cooper Holdings, Inc., previously known as Cooper Laboratories, Dart Industries, Inc., previously known as Rexall Drug Co., Inc., the Dexter Corp., successor in interest of Invenex Laboratories, Emons Industries, Inc., Key Pharmaceuticals, Kremers–Urban Co., now known as Mequon Co., Lannett Co., Inc., Eli Lilly and Co., Lincoln Laboratories, Inc., Malinckrodt, the S.E. Massengill Co., McNeilab, Inc., Merck & Co., Inc., Merrell Dow Pharmaceuticals, Inc., Premo Pharmaceutical Laboratories, Inc., previously known as Lemmon Co. of N.J., Inc., Rite Aid Corp., Rorer Group, Inc., Rowell Laboratories, Inc., Schering Corp., Solvay Pharmaceuticals, Inc., formerly known as Reid–Provident Laboratories, Inc., Stanley Drug Products, Inc., a division of SPERTI Drug Corp., E.R. Squibb & Sons, Inc., the Upjohn Company, West–Ward, Inc., now known as Industrial Way Liquidating Corp., White Laboratories Corp., Defendants.

Nos. CV 91–3748, CV 91–4986.

United States District Court, E.D. New York.

April 13, 1992.

Perry Weitz, Allan Zelikovic, Weitz & Luxenberg, P.C., New York City, for Ashley plaintiffs.

Leonard L. Finz, Stuart Finz, Gregory Green, Law Offices of Leonard L. Finz, P.C., New York City, for Angela Silveri.

Robert D. Wilson, Jr., Patterson, Belknap, Webb & Tyler, New York City, for Abbott Laboratories and McNeilab, Inc.

Edward Patrick Reardon, Staten Island, N.Y., for American Pharmaceutical.

John Budlong, Stafford Frey Cooper & Stewart, Seattle, Wash., Richard J. O'Keefe, O'Keefe, Kline & McCaffrey, White Plains, N.Y., for Boehringer Ingelheim Pharmaceuticals.

Emmett J. Ganz, Law Offices of Emmett J. Ganz, Beverly Hills, Cal., Charles M. McCaghey, Ryan, Ryan, Johnson, Clear & DeLuca, Stamford, Conn., for Boyle & Co.

George I. Greene, Leslie McHugh, Lester Schwab Katz & Dwyer, New York City, for Burroughs–Wellcome & Co. and Merrell Dow Pharmaceuticals.

Margaret M. Johnson, Martin, Clearwater & Bell, New York City, for Carnrick Laboratories.

Carro, Spanbock, Kaster & Cuiffo, New York City, for Chase Chemical.

Vincent J. Aceste, Sally A. Zullo, David E. Worby, P.C., White Plains, N.Y., for Cooper Laboratories (sued herein as Cooper Holdings).

A. Edward Grashof, Sheila Annmarie Moeller, Winthrop, Stimson, Putnam & Roberts, New York City, for Dart Industries and Rexall Drug Co.

Richard Bakalor, Quirk & Bakalor, P.C., New York City, for Dexter Corp., successor in interest of Invenex Laboratories.

Eric D. Statman, Anderson, Kill, Olick & Oshinsky, New York City, for Emons Industries.

Henry R. Simon, White Plains, N.Y., for Key Pharmaceuticals and West-Ward, n/k/a Indust. Way Liquidating Corp.

Mark G. Lionetti, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for Kremers–Urban Co. n/k/a Mequon Co.

Solin, Breindel & Berger, Albany, N.Y., for Lannett Co.

Russel H. Beatie, Jr., Charna L. Gerstenhaber, Kenneth King, Brown & Wood, New York City, for Eli Lilly and Co.

John Sullivan, Michael Yoeli, Gordon & Silber, P.C., New York City, for Lincoln Laboratories.

Gwen Pollack, Laurence V. Senn, Jr., Mudge Rose Guthrie Alexander & Ferdon, New York City, for Malinckrodt.

Theodore V.H. Mayer, Hughes Hubbard & Reed, New York City, for Merck & Co.

Edward S. Weltman, Schneck Weltman Hashmall & Mischel, New York City, for Premo Pharmaceuticals Laboratories and Chromalloy American Corp.

David P. Schaffer, Kelly, Tobias & Turner, New York City, for Rhone–Poulenc Rorer Pharmaceuticals (sued herein as Rorer Group).

John M. Byrne, Elizabeth MacEwen, McMahon, Martine & Merritt, New York City, for Rite Aid Corp.

John C. Maloney, Jr., Sheryl Schwartz, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., for SmithKline Beecham Corp. (sued herein as Beecham Laboratories and S.E. Massengill Co.).

Peter L. Herb, Gladstein & Isaac, New York City, for Solvay Pharmaceuticals, successor in interest of Reid–Provident Laboratories, and Rowell Laboratories.

Marc S. Klein, William B. Korman, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, New York City, for E.R. Squibb & Sons.

Dorothy A. Phillips, Rivkin, Radler & Kremer, Uniondale, N.Y., for Stanley Drug Products.

David M. Covey, Sedgwick, Detert, Moran & Arnold, June A. O'Hea, Jay P. Mayesh, William A. Rome, Stroock & Stroock & Lavan, New York City, for The Upjohn Co.

## MEMORANDUM AND ORDER

### *Personal Jurisdiction*

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I. INTRODUCTION ...............................................557

II. FACTS .......................................................558
 A. Background ...............................................558
 B. Present Actions ..........................................559
 C. Motions ..................................................559

III. NEW YORK SUBSTANTIVE LAW AND RULES AFFECTING SUBSTANTIVE RIGHTS ......................................................560
 A. History of New York Products Liability Law and Mass Tort Law Generally ...........................................560
 B. New York DES Law ........................................563
 C. Constitutionality of New York DES Law ...................565

IV. CHOICE OF LAW .............................................566
 A. *Erie* Doctrine ...........................................566
 B. New York Choice-of-Law Rules in Mass DES Torts..........566
 C. Constitutionality of New York Choice-of-Law Rules in Mass DES Torts...568

V. PERSONAL JURISDICTION .....................................569
 A. New York Jurisdictional Statutes .........................569
 1. C.P.L.R. § 301........................................569
 2. C.P.L.R. § 302........................................569
 B. Constitutionality of New York Statutes ...................573
 1. Current Due Process Doctrine and Problems Raised by Its Application to Mass Torts ........................573
 2. Case Law in Non–Mass Torts ..........................577
 a. *Pennoyer* and Its Problems ......................577
 b. *Pennoyer* to *International Shoe*: The Emergency of Fairness Inquiry ...............................580
 c. *International Shoe*: Sovereignty, Fairness and Nexus Requirements .................................582
 3. Sovereignty and Fairness in Mass Torts ..............584
 4. Due Process Standard for Mass DES Torts..............587

VI. APPLICATION OF LAW TO FACTS .............................589
 A. Boehringer...............................................589
 1. Failure to State a Claim .............................589
 2. Personal Jurisdiction ................................591
 B. Boyle....................................................592
 1. C.P.L.R. § 302(a)(3)(ii) ..............................592
 2. Due Process...........................................593

VII. CONCLUSION ...............................................594

---

## I. INTRODUCTION

This diversity case presents a classic illustration of why traditional limits on personal jurisdiction must be modified for mass torts. The torts alleged here involve numerous claims of injury from exposure *in utero* to diethylstilbestrol (DES). DES was developed and tested in laboratories throughout the country and the world. Permission to use it was sought and obtained from the federal Food and Drug Administration by pharmaceutical companies scattered across the nation. Some companies conducted national advertising and a national corps of salespersons hawked the drug in doctors' offices in every part of the country. Discussions among medical specialists and word-of-mouth information traded among doctors and patients led to national acceptance of the drug as useful for the prevention of miscarriages. Even companies producing

exclusively for local markets relied on the nationally developed understanding and consensus about DES and used knowledge and chemicals from all parts of the United States and the world. Thousands of persons in hamlets and cities across the country are now claiming to have been adversely affected by exposure to the drug. In short, the technology, marketing, sociology, and possible ill effects of DES knew no state boundaries. The national nature of the resulting toxic tort litigation must be reflected in the law's treatment of jurisdictional issues.

Motions to dismiss for lack of jurisdiction raise the following questions: Do the complaints against the moving defendants state a claim under New York's substantive laws? Are those laws constitutional? Are New York's substantive laws applicable under New York's choice-of-law rules? Are those choice-of-law rules constitutional? Do New York's jurisdictional statutes provide for jurisdiction over a successor corporation licensed to do business in New York for causes of action relating to the activities of its predecessor corporation, which never sold DES in New York and was never present in New York? Does New York's long arm statute provide for jurisdiction over a manufacturing corporation which never sold DES in the New York market and was never present in New York? Are New York's jurisdictional statutes constitutional? In light of the specific characteristics and history of the moving defendants, and of all the parties and the suit, would requiring the defendants to litigate in New York be fair so that jurisdiction is not barred by the Constitution and should not be declined under a prudential theory akin to *forum non conveniens?* All must be answered "yes."

## II. FACTS

### A. Background

DES, a synthetic estrogen, was developed in the late 1930s. It was thought to be useful in treating symptoms of certain cancers and menopause, among other things. In 1941, twelve companies formed a committee to oversee submissions in support of a joint New Drug Application for DES to the Food and Drug Administration. On the basis of these submissions, the FDA approved DES for certain uses, not including the prevention of miscarriages.

Researchers were simultaneously discovering that miscarriages were often accompanied by low levels of natural estrogen. In theory, the administration of natural or synthetic estrogen would improve a woman's ability to carry the pregnancy to term. In 1947 and 1948 several of the twelve DES manufacturers sought and were granted permission by the FDA to market DES to prevent miscarriage and fetal death. By 1952 the FDA considered DES proven safe. Hundreds of additional manufacturers then entered the market. Millions of pregnant women ingested DES during the 1950s and 1960s.

In 1971, doctors in Boston concluded that DES was a teratogen responsible for the appearance of adenocarcinoma, a rare form of vaginal cancer, in eight young women who had been exposed to DES in the womb. The FDA soon thereafter disapproved the continued marketing of DES for pregnancy use. There is some evidence that doctors nonetheless continued to prescribe DES through the early 1970s.

Women exposed to DES *in utero* may develop adenosis, a pre-cancerous cell change which can be treated by cauterization or surgery. DES is said to cause a variety of other more serious disorders, including miscarriage, uterine deformities, ectopic pregnancy, and breast cancer. Male fetuses exposed to DES may be at risk of developing undescended testicles, sterility, and deformities. As persons exposed to DES *in utero* age, other medical problems may be linked to DES. There is also evidence that DES daughters pass on defects to their own female children. Whether permanent inheritable genetic damage will be spread more widely in future generations is uncertain.

DES was sold as a generic drug. It was produced in tablets of various dosages according to the same formula by all manufacturers and marketed nationally under a generic description. Pharmacists filled

prescriptions by using DES manufactured by different companies interchangeably. Each of the many manufacturers produced and sold DES for different periods between 1949 and 1971. Some of the companies that made and sold DES no longer exist.

Litigation concerning alleged DES-related injuries has occupied courts around the country since the mid–1970s. In New York state alone, more than 500 DES cases against scores of defendants are pending in state and federal courts. In January of this year, a joint special master/referee was appointed by this court and by New York Supreme Court Justice Ira Gammerman to coordinate settlement negotiations with respect to these cases. *See In re DES Cases*, 142 F.R.D. 58 (E.D.N.Y.1992).

### B. Present Actions

In *Ashley v. Abbott Laboratories*, No. 91–3784, and *Silveri v. Abbott Laboratories*, No. 91–4986, plaintiffs claim injuries from their exposure (or their spouses' exposure) *in utero* to DES. Plaintiff Angela Silveri is a New York resident, as are approximately half of the *Ashley* plaintiffs. The remaining *Ashley* plaintiffs each reside in another state or a foreign country. All plaintiffs allege causes of action sounding in warranty, negligence and strict liability and seek compensatory and punitive damages. Defendants are companies that manufactured and distributed DES or are successors to such companies. Subject matter jurisdiction in each case is predicated on diversity of citizenship.

Defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") has never produced or sold DES, but it is alleged to be responsible for Stayner Corporation, a company that did. Boehringer was incorporated in 1971. In 1979 Stayner was merged into Boehringer. Between 1949 and 1971 Stayner obtained its supply of DES from chemical companies located in California, Tennessee and Ohio, manufactured DES tablets at a plant in California and sold the tablets in California, Oregon, Washington and Montana; undoubtedly the California, Tennessee and Ohio plants obtained some of their supplies from other states. Available figures for the years 1949–56 indicated that Stayner's DES revenues averaged a little over $5,000 per year during that period. Affidavits from senior Stayner employees indicate that the company never was licensed to do business in New York, never maintained an office or agent in New York, never solicited business in New York and never shipped DES to New York. By contrast, Boehringer, a Delaware corporation with its principal place of business in Connecticut, has been authorized to do business in New York since its inception. Boehringer markets its products (which do not include DES) in all states and is licensed to do business in several other states besides New York.

Boyle & Co. ("Boyle") is a closely held California corporation. At oral argument, counsel for Boyle indicated that the company manufactured and sold DES between 1949 and 1960 in California and other states west of the Mississippi River. Sales of DES tablets peaked in 1950, when Boyle sold about 157,000 tablets in packages of 100 and 1,000. Total revenues from all company business reached their highest point in the late 1950s and are now minimal. Boyle claims never to have shipped DES to New York or sold it here. Employee affidavits attest that the company has never been licensed to do business in New York, never maintained an office or agents in New York and never advertised in New York.

### C. Motions

Boehringer has moved to dismiss the complaints under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(2) for failure to state a claim and for lack of personal jurisdiction. Boyle joins in the motion to dismiss for lack of personal jurisdiction. With respect to Angela Silveri and the *Ashley* plaintiffs domiciled in New York, Boehringer's and Boyle's motions must be denied. As applied to the non-New York *Ashley* plaintiffs, defendants' motions will be addressed in a separate memorandum. Subsequent references to plaintiffs in this

memorandum will refer to the New York plaintiffs unless otherwise indicated.

■ On the theory that a court ought to first determine whether a party is properly present before considering substantive issues, the normal practice is to consider 12(b)(2) motions prior to 12(b)(6) motions. *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir.1963) (en banc). Where, as here, a party seeking to dismiss for failure to state a claim is found to be properly present, the normal order may be inverted. The jurisdictional problems in these cases cannot be appreciated except against the backdrop of substantive New York DES law. That law is in turn affected by procedural rules—burdens of proof, statutes of limitations and limits on remedies—that are quasi-substantive in their effects on the outcome of litigation.

Accordingly, there is set out first in Part III A a brief history of New York personal injury law and the changes made within the last decade to meet the problems of mass torts, which are illustrated by reference to asbestos and DES law. In III B, the present law controlling DES, as developed by the New York Court of Appeals in *Hymowitz v. Eli Lilly and Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied*, 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989), and subsequent cases, is discussed. The constitutionality of the somewhat unique New York approach to DES cases is dealt with briefly in III C.

Part IV addresses choice-of-law issues. In IV A, cases requiring a federal court sitting in diversity to look to the choice-of-law rules of the forum state are cited. IV B describes the various choice-of-law principles applied in New York case law and demonstrates that, at least with respect to New York DES plaintiffs, the New York courts would apply New York law. The constitutionality of that choice is considered in IV C.

Part V confronts the most difficult of the problems raised by the defendants' motions—personal jurisdiction. In V A, New York Civil Practice Law and Rules (C.P.L.R.) sections 301 and 302 are inter-preted in the special context of a mass tort resulting from the national distribution by several hundred defendants of a toxic substance with relatively long periods of latency affecting an indeterminate number of plaintiffs, where some of the defendants were selling or "present" in New York and some were not. The constitutionality of the C.P.L.R. provisions as applied to such a mass tort is discussed in V B. Part V B 1 describes the constitutional law of jurisdiction developed for non-mass tort cases and the difficulty of applying it in an unmodified form to mass torts. Part V B 2 & 3 describes the development of current non-mass tort doctrine, its limitations in cases such as the one before the court, and its capacity to be modified to the needs of the present litigation and mass torts generally. Part V B 4 sets out the constitutional standard applicable to DES cases—and perhaps other mass torts.

In Part VI A the facts pertaining to the motions of Boehringer are measured against the standards set out in the preceding parts. In VI B, the Boyle facts are analyzed.

## III. NEW YORK SUBSTANTIVE LAW AND RULES AFFECTING SUBSTANTIVE RIGHTS

### A. History of New York Products Liability Law and Mass Tort Law Generally

Despite undergoing several transformations, New York's tort law still oscillates within the poles established by Judge Cardozo in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), and *Palsgraf v. Long Island Railroad Co.*, 248 N.Y. 339, 162 N.E. 99 (1928). *MacPherson* opened the frontier of modern negligence law by abolishing the requirement of privity between tortfeasor and plaintiff. *Palsgraf* then established the boundaries of the conceptual terrain by limiting defendants' liability to foreseeable classes of plaintiffs suffering foreseeable classes of harms. The principles of these cases were meant to serve as the basis for a system of liability that could give due consideration to the interests of injured plaintiffs, defendants,

the judicial system and the general public while remaining flexible enough to accommodate social change. Subsequent modifications in New York product liability law have relied on the same principles to effect the same goals in light of the massive socioeconomic and technological changes of this century.

The first major doctrinal development following *Palsgraf* did not occur until the 1970s, when New York's courts overhauled prevailing warranty theories of liability and replaced them with strict liability for defectively manufactured and designed products, as well as for products with inadequate warnings. *See Codling v. Paglia,* 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973) (recasting third party causes of action previously sounding in implied warranty as sounding in strict liability); *see also Torrogrossa v. Towmotor Co.,* 44 N.Y.2d 709, 405 N.Y.S.2d 448, 376 N.E.2d 920 (1978) (improper warning); *Micallef v. Miehle Co.,* 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571 (1976) (design defects); *Victorson v. Bock Laundry Mach. Co.,* 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275 (1975) (manufacturing defects). Quasi-substantive laws such as statutes of limitations were adapted concurrently with the transition to strict liability. *See, e.g., Victorson,* 37 N.Y.2d at 399–400, 373 N.Y.S.2d 39, 335 N.E.2d 275 (applying three-year statute of limitations to strict liability actions; overruling *Mendel v. Pittsburgh Plate Glass Co.,* 25 N.Y.2d 340, 305 N.Y.S.2d 490, 253 N.E.2d 207 (1969)). Changes in common law were also accompanied by legislative action. *See* C.P.L.R. § 214–c(2) (1986) (time for commencing latent personal injury and property damage actions "computed from the date of discovery of the injury . . . or from the date when . . . such injury should have been discovered"); *id.* § 1411 (1975) (adopting pure comparative negligence); N.Y. General Obligation Law § 15–108(b) (1974) (limiting contribution suits against settling tortfeasors by non-settling, jointly liable tortfeasors); *In re E. & S. Dists. Asbestos Litig.,* 772 F.Supp. 1380, 1391–93 (E. & S.D.N.Y.1991) (applying statutory changes).

While carving out a doctrine analytically distinct from negligence in a conscious attempt to adapt tort law to the development of an economy of mass marketed, mass produced consumer goods, *see Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983); *Codling,* 32 N.Y.2d at 341, 345 N.Y.S.2d 461, 298 N.E.2d 622, modern cases and statutes operate within the parameters marked by Judge Cardozo even as they advance the cause of injured plaintiffs and seek to protect defendants against the unfair imposition of liability. *See, e.g., Voss,* 59 N.Y.2d at 107–10, 463 N.Y.S.2d 398, 450 N.E.2d 204 (manufacturer responsible only for injuries proximately caused by "unreasonably" dangerous product when used in intended ways). The "new" product liability law was of a piece with the "old" negligence and warranty law in another respect; all grew up in the shadow of the industrial revolution. The cases in which the law was being crafted typically involved individuals suing manufacturers and distributors for injuries sustained in industrial, automobile or household accidents. The courts were mainly concerned with addressing such cases in light of the increased distance between manufacturer and consumer that resulted from mass production and marketing.

The phenomenon of mass torts prompted the next wave of doctrinal innovation, which began in the late 1970s and continues today. Some of these mass torts—for example, air crash and other disasters—are really better termed "large torts": they involve an expansion of scale that can be accommodated with little conceptual change. The most difficult litigation issues in these cases pertain to joinder of parties to ensure efficient litigation and particularly whether to employ a federal or state class action device. *See generally In re Joint E. & S. Dist. Asbestos Litig.,* 129 B.R. 710, 802–11 (E. & S.D.N.Y.1991) (discussing advantage of class action device in multiple suits). True mass torts, by contrast, raise qualitatively different and more intractable problems. These cases typically involve the torts of a post-industrial age,

the so-called mass toxic torts, although not all toxic torts have required doctrinal innovation and some non-toxic torts have. *See Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972) (adopting industry-wide liability for manufacturers of blasting caps injuring plaintiffs at different places and times); *Snyder v. Hooker Chems. & Plastics Corp.*, 104 Misc.2d 735, 429 N.Y.S.2d 153 (Sup.Ct.1980) (denying class action certification for Love Canal litigation in light of limited number of plaintiffs and localized nature of alleged injuries).

Genuine mass torts possess some or all of the following features: (1) geographically widespread exposure to potentially harmful agents that (2) affects a large or indeterminate number of plaintiffs, (3) possibly over long time periods, even generations, (4) in different ways such that (5) there is difficulty in establishing a general theory of causation and (6) an inability to link a particular defendant's actions to a particular plaintiff's injuries, as well as (7) difficulty in determining the number of potentially responsible defendants and (8) in determining their relative culpability, if any, which often results in (9) multiple litigations that burden the courts and cause huge transactional costs, including heavy legal fees, and (10) which threatens the financial ability of many companies or of whole industries to respond to traditional damage awards.

Experience indicates that these features of mass torts conspire to hinder efficient judicial disposition. While in some instances legislative solutions have been proposed and adopted, *see, e.g.*, 30 U.S.C. §§ 901–45 (1988) (Black Lung Benefits Act); 42 U.S.C. §§ 300aa–10 to 306aa–23 (1988) (National Vaccine Injury Compensation Program); 42 U.S.C. § 2210 (1988) (Price–Anderson Act), our political system has left primary responsibility with courts and state legislatures to establish practicable and just rules for compensating mass tort victims.

The litigation complexities raised by mass torts are legion. The place and manner of exposure to the alleged harm-producing agents are often impossible to determine for purposes of establishing a "locus" state. Very complex questions as to jurisdiction, choice of law, liability, causation and damage apportionment typically result. Often, as here, parallel cases are brought simultaneously in the federal and state courts of many states. There is jockeying among plaintiffs' attorneys for control and fees. Where the compensatory and punitive damages sought are greater than potential defendants' combined assets, a race to the civil and bankruptcy courthouses results. Even where there is no shortage of funds, litigation in multiple fora ultimately produces unfair and inefficient results: similarly situated plaintiffs obtain disparate remedies, state and federal courts across the country are clogged and costs become exceptionally high.

To begin to address these issues, the federal and state courts have bent traditional substantive rules of tort law through doctrinal innovations such as enterprise, concerted action, and market share liability. *See, e.g., Hall v. E.I. Du Pont De Nemours & Co.*, 345 F.Supp. 353 (E.D.N.Y.1972) (industry-wide liability); *Bichler v. Eli Lilly and Co.*, 55 N.Y.2d 571, 580–84, 450 N.Y.S.2d 776, 436 N.E.2d 182 (1982) (upholding use of concerted action theory in DES case where defendant did not object); *Sindell v. Abbott Lab.*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924 (market share liability), *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). Likewise, it has forced them to confront and sometimes rely on new forms of expert testimony and epidemiological evidence. *See, e.g., DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941 (3d Cir.1990) (discussing use of statistical evidence in Bendectin litigation). On occasion courts have had to establish and supervise nontraditional remedies, such as trusts for future claimants. *See, e.g., In re "Agent Orange" Prod. Liab. Litig.*, 781 F.Supp. 902, 909–11 (E.D.N.Y.1991) (describing establishment and operation of programs to distribute settlement funds).

Existing procedural law can provide some assistance to courts confronting mass torts. In the federal courts, litigation can be consolidated by means of transfer of

venue under 28 U.S.C. sections 1404 and 1406 and by the doctrine of *forum non conveniens.* Under 28 U.S.C. § 1407, the judicial panel on multidistrict litigation can coordinate such consolidations. Necessary further innovations, however, including the establishment of alternative jurisdictional rules, generally have been slow in developing. While the need to fully and finally resolve interpleader actions has prompted statutory provisions for nationwide jurisdiction in those cases, *see* 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1701, at 487 (2d ed. 1986), similar provisions for mass torts, which raise similar considerations, have not been adopted. *See generally* Rowe, *Jurisdictional and Transfer Proposals for Complex Litigation,* 10 Rev. Litig. 325 (1991). For example, the proposed Court Reform and Access to Justice Act of 1988 and the Multiparty, Multiforum Jurisdiction Act of 1989 (the Kastenmeier Bill) would have provided for nationwide service of process in certain large-scale diversity actions. *See generally* Rowe & Sibley, *Beyond Diversity: Federal Multiparty, Multiforum Jurisdiction,* 135 U.Pa.L.Rev. 7 (1986); Erichson, Note, *Nationwide Personal Jurisdiction in All Federal Question Cases: A New Rule 4,* 64 N.Y.U.L.Rev. 1117, 1161–62 (1989) (citing proposals for jurisdiction in mass cases).

The states, because they do not form a unitary system, have more difficulty coordinating the efficient resolution of mass torts. Joint federal-state cooperation that might alleviate some problems is still in its infancy. *See, e.g., In re DES Cases,* 142 F.R.D. 58 (E.D.N.Y.1992) (joint appointment of special master/referee); American Law Institute, *Complex Litigation Project,* Tentative Draft No. 2, Chs. 3 & 5 (April 6, 1990) (proposed statute for federal-state and state-federal consolidations). There are to date only proposals for coordinating efforts among the states. *See* American Law Institute, *Complex Litigation Project,* Tentative Draft No. 3, Ch. 4 (March 31, 1992) (suggesting procedures for consolidating complex litigation among state courts). Thus, the states generally

are required to improvise in order to cope with the realities of modern mass torts.

The New York courts' initial response to mass torts understandably was marked by caution. *See, e.g., Steinhardt v. Johns-Manville Corp.,* 54 N.Y.2d 1008, 446 N.Y.S.2d 244, 430 N.E.2d 1297 (1981) (declining to interpret New York tort statute of limitations as running from time of "discovery" rather than time of "exposure" for latent injuries), *cert. denied,* 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982); *Rosenfeld v. A.H. Robins Co.,* 63 A.D.2d 11, 407 N.Y.S.2d 196 (declining to adopt New York class action device in Dalkon Shield litigation), *appeal dismissed,* 46 N.Y.2d 731, 413 N.Y.S.2d 374, 385 N.E.2d 1301 (1978). In the best tradition of the states as laboratories for experimentation in social and economic policy, however, *see New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting), the state legislature, prompted in part by judicial frustration, has instituted important modifications in quasi-substantive law over the last decade, most notably in the area of statutes of limitations. *See* C.P.L.R. § 214–b (statute of limitations for actions by veterans for exposure to Agent Orange to run from date of discovery of injury rather than date of exposure); *Id.* § 214–c(2) and Historical and Revision Notes (establishing "discovery" rule for toxic torts and allowing one-year revival for previously barred claims). This legislation has in turn prompted the courts to take the bolder steps in dealing with DES mass tort litigation described below. Further innovations have been achieved through cooperation between the New York federal and state courts in handling asbestos cases. *See In re E. & S. Dists. Asbestos Litig.,* 772 F.Supp. 1380, 1385–86 (E. & S.D.N.Y.1991).

### B. New York DES Law

In 1982, the New York Court of Appeals first confronted the issue of how to apportion liability in DES cases where plaintiffs cannot identify which manufacturer's product caused their injuries. In *Bichler v. Eli Lilly and Co.,* 55 N.Y.2d 571, 580–84, 450

N.Y.S.2d 776, 436 N.E.2d 182 (1982), the court upheld on appeal a jury finding that DES defendants were jointly liable for plaintiff's injuries on a concerted action theory. That decision was predicated on a procedural point: the defendants had not objected to the inclusion of concerted action jury instructions.

In *Hymowitz v. Eli Lilly and Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied*, 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989), the Court of Appeals frontally addressed the problem of apportioning liability. Rather than rely on *Bichler, id.* 55 N.Y.2d at 580, 450 N.Y.S.2d 776, 436 N.E.2d 182, *Hymowitz* followed the course charted in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980), and *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). Those cases adopted a scheme under which DES manufacturers are severally liable according to each manufacturer's share of the national market at the time of plaintiff's exposure.

 California law provides exculpation, however, to any manufacturer that can prove its product did *not* injure a plaintiff—for example, by establishing that its product was not distributed where plaintiff's mother purchased DES or was produced in a color or shape different from that which plaintiff's mother recalls taking. *See Sindell*, 163 Cal.Rptr. at 145, 607 P.2d at 937. The *Hymowitz* court, while adopting several liability based on national market share, departed from the California approach by not allowing "exculpation of a defendant who, although a member of the market producing DES for pregnancy use, appears not to have caused a particular plaintiff's injury." *Hymowitz*, 73 N.Y.2d at 512, 541 N.Y.S.2d 941, 539 N.E.2d 1069. The court noted: "It is merely a windfall for a producer to escape liability solely because it manufactured a more identifiable pill, or sold only to certain drugstores." *Id.* Under the *Hymowitz* rule, only those defendants that can prove that they never participated in the marketing of DES for use by pregnant women are exculpated. *Id.* This rule apparently is a default rule: one-hundred percent liability will still be assessed against a single manufacturer where it can be shown that its product was the only one taken by the plaintiff's mother. *See Rubel v. Eli Lilly and Co.*, 1991 WL 29895, at *5 (S.D.N.Y.1991).

The Court of Appeals acknowledged that the *Hymowitz* rule marked a modification of conventional tort law principles even beyond the innovations of the California cases. It conceded that, unlike the California rule, the New York rule "will likely result in a disproportion between the liability of individual manufacturers and the actual injuries each manufacturer caused in [New York] State," *id.* 73 N.Y.2d at 511–12, 541 N.Y.S.2d 941, 539 N.E.2d 1069, and will not "provide a reasonable link between liability and the risk created by a defendant to a particular plaintiff." *Id.* at 512, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (citation omitted). In short, without imposing collective responsibility on each manufacturer for the acts of others, *see id.* at 508, 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (rejecting concerted action theory and joint and several liability), the Court of Appeals effectively converted the geographically dispersed companies that manufactured DES into a unitary, national industry for purposes of allocating the cost of DES-related injuries. By recognizing that the particular corner of the market within which a given defendant happened to operate is, for purposes of apportioning liability for injuries caused by a nationally marketed generic good, entirely fortuitous and arbitrary, the Court of Appeals struck upon "an equitable way to provide plaintiffs with the relief they deserve, while also rationally distributing the responsibility for plaintiffs' injuries among defendants." *Id.* at 512, 541 N.Y.S.2d 941, 539 N.E.2d 1069.

*Besser v. E.R. Squibb & Sons*, 146 A.D.2d 107, 539 N.Y.S.2d 734 (App.Div. 1st Dep't 1989), *aff'd*, 75 N.Y.2d 847, 552 N.Y.S.2d 923, 552 N.E.2d 171 (1990), indicates a probable limitation on the *Hymowitz* rule: it may, as a practical matter, be available almost exclusively to persons

with a substantial connection to New York. *Besser* held that the New York statute reviving time-barred DES suits was not intended to modify the New York borrowing statute that requires application of shorter foreign statutes of limitations to causes of action arising outside of New York in favor of non-New York residents. *Id.* 539 N.Y.S.2d at 736–39. The ruling was justified in part as a means of preventing persons exposed to DES in other states from bringing their litigation to New York. *See id.* at 739.

In recognizing the need to modify substantive and quasi-substantive law in light of the problems of DES mass torts, the New York courts have begun another period of adjustment. Chief Judge Wachtler, writing for a unanimous Court of Appeals, recently noted the parallel between the development of DES law and the adoption of strict liability. Both, the opinion said,

> were responses to gaps in traditional tort doctrines that left unprotected an entire class of plaintiffs whose real and substantial injuries were the product of the ever-increasing complexity of modern society.

*In re DES Market Share Litig.*, 79 N.Y.2d 299, 582 N.Y.S.2d 377, 591 N.E.2d 226, (1992). The same message was conveyed by the court in *Enright v. Eli Lilly and Co.*, 77 N.Y.2d 377, 568 N.Y.S.2d 550, 570 N.E.2d 198 *cert. denied,* — U.S. —, 112 S.Ct. 197, 116 L.Ed.2d 157 (1991), which barred DES manufacturers' liability to third generation DES plaintiffs. Under *Enright*, plaintiffs cannot recover for injuries to granddaughters of women who took DES during pregnancy even if it is proven that the granddaughters were adversely affected. The rationale for the decision was essentially that of *Palsgraf:* under established notions of proximate cause, defendants cannot be held culpable for unforeseeable classes of harms to unforeseeable classes of plaintiffs. *See Holmes v. Securities Investor Protection Corp.,* — U.S. —, —, 112 S.Ct. 1311, 1318, 117 L.Ed.2d 532 (1992) (Proximate cause "label[s] generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At

bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.' ") (quoting W. Keeton, *et al., Prosser and Keeton on the Law of Torts* § 41, at 264 (5th ed. 1984)). *Compare Palsgraf v. Long Island R.R.,* 248 N.Y. 339, 343, 162 N.E. 99 (1928) ("life will have to be made over, and human nature transformed, before prevision so extravagant can be accepted as the norm of conduct") *with Enright,* 77 N.Y.2d at 387, 568 N.Y.S.2d 550, 570 N.E.2d 198 ("[T]he cause of action plaintiffs ask us to recognize ... could not be confined without the drawing of artificial and arbitrary boundaries.... It is our duty to confine liability within manageable limits.") (citations omitted).

## C. Constitutionality of New York DES Law

 New York DES common and statutory laws, although innovative, function within traditional tort principles. Legislation concerning traditional tort law that does not affect fundamental rights is subject to minimal constitutional limitation. *See, e.g., Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 88 & n. 32, 98 S.Ct. 2620, 2638 & n. 32, 57 L.Ed.2d 595 (1978). Quasi-substantive legislation related to tort law is also normally subject to a rational basis test. *See Hymowitz,* 73 N.Y.2d at 513–16, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (legislation reviving time-barred tort actions constitutional because rational). Common law tort rules articulated by a state's highest court are entitled to the same deference. *See In re Asbestos Litig.,* 829 F.2d 1233, 1239–40 (3d Cir.1987), *cert. denied,* 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988).

 The Supreme Court has declined to entertain constitutional challenges to California and New York DES law. *Hymowitz v. Eli Lilly and Co.,* 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied,* 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989); *Sindell v. Abbott Lab.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980). The Court also

chose not to review the Third Circuit decision upholding the more radical departure from conventional tort principles in *Beshada v. Johns–Manville Prods. Corp.*, 90 N.J. 191, 447 A.2d 539 (1982). *See In re Asbestos Litig.*, 829 F.2d at 1240–44. *Beshada* holds asbestos manufacturers strictly liable for product defects and declares irrelevant claims by defendants that the defects were unknown and unknowable at the time of manufacture. The Third Circuit rejected Due Process and Equal Protection Clause challenges to *Beshada* in light of the states' near plenary authority over tort law, *id.* at 1243, and "the extraordinary size" and "unprecedented phenomenon" of asbestos mass torts. *Id.* Identical considerations confirm the constitutionality of New York's DES laws.

Because *Hymowitz*'s elimination of a common law defense available in other jurisdictions does not affect a fundamental right, *id.* at 1239, and because it provides a rational and workable means of protecting New York residents from DES-caused injuries, its rule does not offend the Constitution.

## IV. CHOICE OF LAW

### A. *Erie* Doctrine

■ *Hymowitz*, as indicated above, departs from the law of California and of other states which have developed special rules for DES cases. This suggests potential conflicts of law. The question in this diversity action is whether New York State substantive DES law applies.

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), requires a New York federal court sitting in diversity to apply New York choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Analysis of New York cases indicates that New York substantive law applies to these actions. Application of New York law to suits by New York plaintiffs for torts occurring in New York does not violate the Constitution.

### B. New York Choice-of-Law ·Rules in Mass DES Torts

The New York Court of Appeals has had frequent occasion to consider choice-of-law rules for tort cases. *See generally*, Korn, *The Choice-of-Law Revolution: A Critique*, 83 Colum.L.Rev. 772 (1983); *In re Joint E. & S. Dist. Asbestos Litig.*, 129 B.R. 710, 886–89 (E. & S.D.N.Y.1991). While mass cases can raise complicated choice-of-law issues, *see, e.g.*, Weintraub, *Methods for Resolving Conflict-of-Laws Problems in Mass Tort Litigation*, 1989 U.Ill.L.Rev. 129, the cornerstone for analysis in New York tort cases remains Chief Judge Fuld's path-breaking opinion in *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). In *Babcock*, the plaintiff passenger was injured when the defendant driver crashed his car on a Canadian road. Both plaintiff and defendant were residents of New York. Ontario law barred a negligence action by a guest passenger against a driver, whereas New York law allowed such an action.

Rejecting the automatic application of the traditional rule of *lex locus delicti*, Chief Judge Fuld wrote that "controlling effect" ought to be given to

> the law of the jurisdiction which, because of its relationship or contact with the occurrence or parties has the greatest concern with the specific issue raised in the litigation.

*Id.* at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279. In applying this standard to the facts of the case, the opinion then distinguished between laws regulating primary conduct (for example, laws defining what constitutes negligence) and laws distributing losses (for example, rules apportioning liability among defendants already determined to be liable). *Id.* at 483, 240 N.Y.S.2d 743, 191 N.E.2d 279; *see also Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (noting *Babcock*'s distinction between "standards of conduct" and "rules allocating losses"). *Babcock* maintained that, in the event of a conflict between laws of the former type, the state

in which the alleged wrongful conduct occurred normally will have "a predominant, if not exclusive, concern" in having its law apply. *Babcock*, 12 N.Y.2d at 483, 240 N.Y.S.2d 743, 191 N.E.2d 279. The interest of the locus state is by contrast diminished where the conflict is between loss-distribution rules. *Id.* Characterizing the Ontario bar on passenger negligence actions as a loss allocation rule, and noting the common domicile of plaintiff and defendant, the court applied New York law.

Although *Babcock* itself involved a case in which plaintiff and defendant were both New York domiciliaries, its principles were subsequently extended to cases in which there is no common domicile. *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), again involved the issue of whether to apply Ontario or New York law with respect to the liability of automobile drivers to their passengers. Plaintiff was a Canadian citizen domiciled in Ontario which was also the locus of the tort. The defendant was a resident of New York. The court found it appropriate to apply provisions of Ontario law limiting liability of drivers to their guests by requiring proof of gross negligence.

■ The Court of Appeals enunciated three principles for dealing with conflicts of laws concerning limitations on drivers' liability to their guests, and, by implication, other loss-distribution rules. *See Schultz*, 65 N.Y.2d at 201, 491 N.Y.S.2d 90, 480 N.E.2d 679 (generalizing *Neumeier*'s third principle). Relevant to the instant litigation is the second *Neumeier* principle, which holds in relevant part that, for conflicts between loss-distribution rules in cases where the locus of injury is the plaintiff's domicile and the locus state's law favors the plaintiff, the law of that state should apply absent "special circumstances." *Neumeier*, 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454. Practically speaking, the upshot of *Babcock*, *Neumeier* and subsequent cases is that New York, as the forum state, applies its own law unless there is a strong reason not to do so. *See* Korn, *The Choice-of-Law Revolution*, *supra*.

■ The cases now being considered involve New York plaintiffs suing non-New York domiciliaries. The final element of the equation—the locus of the torts alleged in plaintiffs' complaints—is also for the most part New York. Although in determining personal jurisdiction the court would usually deem a defendant's alleged tortious acts to have occurred at the place of manufacture, *see Feathers v. McLucas*, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), the locus of the tort for choice-of-law purposes is "the place where the last event necessary to make the actor liable occurred." *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 (citations omitted); *see also Feathers*, 15 N.Y.2d at 463, 261 N.Y.S.2d 8, 209 N.E.2d 68 (distinguishing determination of tort locus in jurisdictional and choice-of-law analyses). The relevant "last event" in these cases was the ingestion of DES by plaintiffs' mothers or the birth of the injured child. Absent any proof to the contrary, the court must assume that the bulk of these critical events occurred in New York.

■ Given these facts, *Babcock* and subsequent cases mandate application of New York law in the event of any conflict. *Accord Rubel v. Eli Lilly and Co.*, 681 F.Supp. 151, 153 (S.D.N.Y.1987). A conflict between another state's DES law allowing defendants to exculpate themselves and the New York rule denying this defense arguably may be viewed as a conflict of rules governing primary conduct. If this is true, then *Babcock* would require the application of New York law. *See Babcock*, 12 N.Y.2d at 483, 240 N.Y.S.2d 743, 191 N.E.2d 279; *see also Schultz*, 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679. Even if the laws in conflict are treated as loss-distribution rules, New York law would apply. Under *Neumeier*'s second principle, where plaintiff and defendant are not common domiciliaries, the tort occurs in plaintiff's domicile and the domicile's law favors the plaintiff, the presumption in favor of applying the law of the state where the tort "occurred"—here New York, where the drug was taken and worked its

effect—can be overcome only by a showing of "special circumstances."

If anything, the special circumstances of this case further favor application of New York law. *Hymowitz* represents a strong policy statement by the highest New York court addressing a national problem. It envisions hundreds of suits by New York plaintiffs against manufacturers located across the country. The Court of Appeals could not have designed a novel set of substantive rules for dealing with such mass litigation only to have them fall into desuetude because choice-of-law principles favor application of the law of defendants' domiciles. A finding that the law of each defendant's state law applies would not merely cripple the New York courts in their attempt to process DES litigation efficiently; it would undermine the very policy that *Hymowitz* and subsequent cases have developed. Given that the New York Court of Appeals was among the first to depart from prior rigid conflicts rules, *see* Korn, *The Choice-of-Law Revolution, supra*, at 776, and given that it did so to ensure the enforcement of New York policy protecting state residents and litigants in the state's courts, it is exceedingly unlikely that the Court of Appeals would apply its choice-of-law rules to undercut the law of *Hymowitz* and other DES cases.

Such a result also comports with the practicalities of mass tort cases. To the fullest possible extent, such cases should be consolidated for pretrial discovery and motions, settlement discussions and trial; administered by one or a few judges; and tried under one set of substantive and procedural rules applicable to all consolidated cases. It has been suggested that the last of these desiderata can be secured, at least in the federal courts, by the enactment of a federal choice-of-law statute for complex litigations. *See* American Law Institute, *Complex Litigation Project*, Council Draft No. 3, Ch. 6 (Nov. 22, 1991). For the time being, *Hymowitz*, New York conflicts laws and federal procedural law allow for the efficient disposition of these cases under New York substantive law.

## C. Constitutionality of New York Choice-of-Law Rules in Mass DES Torts

■ The Supreme Court has held that the Due Process and Full Faith and Credit Clauses place a "modest" limit on the operation of state choice-of-law rules. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105 S.Ct. 2965, 2977, 86 L.Ed.2d 628 (1985). Thus,

[i]n order to ensure that the choice of law is neither arbitrary nor fundamentally unfair, the Court has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests, with the parties and the occurrence or transaction.

*Allstate Ins. Co. v. Hague*, 449 U.S. 302, 308, 101 S.Ct. 633, 638, 66 L.Ed.2d 521 (1981) (citation omitted).

*Shutts* represents the Court's most recent word on this subject. The defendant, a corporate domiciliary of Delaware and Oklahoma, was sued in Kansas state court by a class of plaintiffs owning rights to royalty payments on leases under which defendant produced and sold natural gas. The leased land was located in eleven states. The three named plaintiffs resided in Kansas or Oklahoma and owned leases in Texas and Oklahoma. As originally defined, the class included 33,000 persons. Of the 28,100 who received notice and did not opt out, fewer than 1,000 resided in Kansas.

The trial and appellate courts of Kansas applied Kansas law and found the defendant liable. Noting potential conflicts between Kansas, Texas and Oklahoma law, the Supreme Court reversed. It held that application of Kansas law was not supported by a "significant contact or significant aggregation of contacts" between Kansas and the claims of each class member, as required under *Allstate*. Crucial to this ruling was the fact that 97% of the plaintiff class and 99% of the leases had no connection with Kansas other than the lawsuit. *See id.* 472 U.S. at 815, 105 S.Ct. at 2976. Since, as a practical matter, inertia keeps most class members from exercising their right to opt out, the vast bulk of the

plaintiffs would have been bound by the law of a state with which they had no contact.

The instant cases are worlds away from *Shutts.* All of the plaintiffs exposed to DES with whom the court is now concerned have been residents in New York since before this litigation began. Their injuries occurred in New York. New York thus has "a significant aggregation of contacts with the parties and the occurrence, creating state interests, such that application of its law [i]s neither arbitrary nor fundamentally unfair." *Allstate,* 449 U.S. at 320, 101 S.Ct. at 644. On these facts, it is arguable that no forum has any greater interest in this litigation than New York. The application of New York law in these cases cannot be unconstitutionally arbitrary or fundamentally unfair.

### V. PERSONAL JURISDICTION

Personal jurisdiction must be determined in the first instance according to the jurisdictional law of the forum—New York. *Arrowsmith v. United Press Int'l,* 320 F.2d 219 (2d Cir.1963) (en banc). The application of New York law must then be measured against due process limits. *See, e.g., International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

New York and federal law place the burden of proving facts supporting jurisdiction on the plaintiff. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir. 1985); *Connell v. Hayden,* 83 A.D.2d 30, 443 N.Y.S.2d 383, 388 (1981). Under federal standards, the pleadings must be construed most favorably to the plaintiff. *Hoffritz,* 763 F.2d at 57.

### A. New York Jurisdictional Statutes

Possible state law bases for jurisdiction over the moving defendants are found in sections 301 and 302(a)(3) of the New York C.P.L.R.

### 1. *C.P.L.R. § 301*

Section 301 incorporates common law bases for jurisdiction existing at the time of the section's enactment in 1962. It provides simply that "[a] court may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore." One established basis for jurisdiction is consent. Under New York case law from before and after 1962, "[w]hen a foreign corporation is licensed to do business in New York, it consents to be sued on causes of action arising within and without the State." *LeVine v. Isoserve, Inc.,* 70 Misc.2d 747, 334 N.Y.S.2d 796, 799 (Sup.Ct. 1972) (citing, *inter alia, Bagdon v. Philadelphia & Reading Coal & Iron Co.,* 217 N.Y. 432, 111 N.E. 1075 (1916)). A defendant's engagement in "a continuous and systematic course of 'doing business'" in New York is another basis for general jurisdiction incorporated into section 301. *Simonson v. International Bank,* 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964).

### 2. *C.P.L.R. § 302*

By contrast, section 302 is a long arm provision. Section 302(a)(3) allows, under certain conditions, jurisdiction over non-residents for tortious acts occurring outside New York. The section was not intended to reach the limits of long arm jurisdiction allowed under the federal Constitution. *Banco Ambrosiano v. Artoc Bank & Trust, Ltd.,* 62 N.Y.2d 65, 71, 476 N.Y.S.2d 64, 464 N.E.2d 432 (1984).

Section 302(a)(3)(ii) is the provision which applies to the activity of companies alleged not to have conducted any business in New York. It provides for jurisdiction over defendants whose out-of-state tortious acts cause injury to a person within the state, so long as the tortfeasor should have expected its act to have consequences in the state and it derives substantial revenue from interstate or international commerce. It reads:

(a) As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent ... (3) commits a tortious act without the state causing injury to person or property within the state ... if he ... (ii) expects

or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

There is a developed body of case law interpreting the scope and meaning of the "injury within the state," "reasonable expectation of consequences," and "substantial revenue" conditions on the exercise of jurisdiction under section 302(a)(3)(ii).

Establishing that an out-of-state defendant's revenue from interstate commerce is "substantial" requires examination of either the percentage of a defendant's revenues that is derived from interstate commerce or the absolute amount of revenue generated by interstate commercial activities. *Ronar, Inc. v. Wallace*, 649 F.Supp. 310, 316 (S.D.N.Y.1986). The actual numbers that have sustained or failed to sustain a claim of substantial revenue vary considerably, making it difficult to define the point at which revenue becomes "substantial." *See id.* at 317. This element is not at issue in the present case since, during the period when the movants were selling DES, both received substantial revenues from commerce in several states.

With respect to the existence of an in-state injury, the general rule is that " 'the situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.' " *Carte v. Parkoff*, 152 A.D.2d 615, 543 N.Y.S.2d 718, 719 (1989) (citations omitted). Most of the complexities in this element concern the locus of a commercial injury such as loss of business. *See, e.g., Cooperstein v. Pan–Oceanic Marine, Inc.*, 124 A.D.2d 632, 507 N.Y.S.2d 893, 895 (1986) (plaintiff alleging economic injury based on transactions with Virginia and Florida cannot claim injury occurred in New York), *appeal denied*, 69 N.Y.2d 611, 517 N.Y.S.2d 1025, 511 N.E.2d 84 (1987). As applied to non-commercial tort cases, the situs rule is meant to prevent parties from carrying injuries that occurred out of state back to New York in order to bring suit. *See, e.g., Twine v. Levy*, 746 F.Supp. 1202, 1206 (E.D.N.Y.1990) (where malpractice suit is based on treatment in defendant's out-of-state office, injury occurred out of state); *Carte*, 543 N.Y.S.2d at 719 (same); *Hermann v. Sharon Hosp., Inc.*, 135 A.D.2d 682, 522 N.Y.S.2d 581, 583 (1987) (same); *Black v. Oberle Rentals, Inc.*, 55 Misc.2d 398, 285 N.Y.S.2d 226, 228–29 (Sup. Ct.1967) (in suit based on car accident in Massachusetts, injuries occurred in Massachusetts).

■■■ Where, as here, an allegedly harmful drug is ingested in New York, or acts upon a resident of the state while the resident is in the state or upon her progeny when they are in the state, the situs of the injury is New York: there is no sense in which plaintiffs have merely carried their injuries into the state for the purpose of bringing suit. Moreover, to construe plaintiffs' injuries as having occurred at the place of manufacture rather than the place of exposure would defeat the purpose of section 302(a)(3)(ii) by making its reach coextensive with that of section 302(a)(2), which covers only torts committed within the state. *See Friedr. Zoellner (New York) Corp. v. Tex Metals Co.*, 278 F.Supp. 52, 56 (S.D.N.Y.1967) (section 302(a)(3)(ii) "was designed ... to cover cases where products purchased or manufactured in another jurisdiction caused injury in New York") (emphasis omitted) (citations omitted), *aff'd*, 396 F.2d 300 (2d Cir.1968).

The "reasonable expectation" element of section 302(a)(3)(ii) requires that a defendant foresee that its tortious act will have *some* consequences in New York, although not necessarily the exact consequences that occurred. *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dep't 1974); *Tracy v. Paragon Contact Lens Lab., Inc.*, 44 A.D.2d 455, 355 N.Y.S.2d 650, 652–53 (3d Dep't 1974).

■■■ As to this element, the lower New York courts have been particularly concerned to avoid any potential conflict with federal constitutional due process limits on state court jurisdiction as set out in cases like *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). They have thus asserted that the mere likelihood that a defen-

dant's product will find its way into New York does not satisfy this element, and that purposeful availment of the benefits of the laws of New York such that the defendant may reasonably anticipate being haled into New York court is required. *See Martinez v. American Standard*, 91 A.D.2d 652, 457 N.Y.S.2d 97, 98–99 (1982), *aff'd*, 60 N.Y.2d 873, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983); *see also Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 564 N.Y.S.2d 865, 866 (3d Dep't 1991) ("foreseeability must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market"); *Murdock v. Arenson Int'l USA, Inc.*, 157 A.D.2d 110, 554 N.Y.S.2d 887, 889 (1st Dep't 1990) (same); *Cooperstein v. Pan-Oceanic Marine, Inc.*, 124 A.D.2d 632, 507 N.Y.S.2d 893, 895 (1986) (same), *appeal denied*, 69 N.Y.2d 611, 517 N.Y.S.2d 1025, 511 N.E.2d 84 (1987); *Prentice v. Demag Material Handling Ltd.*, 80 A.D.2d 741, 437 N.Y.S.2d 173, 175 (4th Dep't 1981) (same); *Tracy v. Paragon Contact Lens Lab., Inc.*, 44 A.D.2d 455, 355 N.Y.S.2d 650, 653 (3d Dep't 1974) (same).

Requiring that a defendant reasonably expect to be haled into New York court is not a workable basis for determining jurisdiction since the test itself is circular. The reasonableness of that expectation, unlike the expectation that out-of-state acts will have forum consequences, depends entirely on the content of New York's jurisdictional laws. *See* Redish, *Due Process, Federalism, and Personal Jurisdiction: A Theoretical Evaluation*, 75 Nw.U.L.Rev. 1112, 1134 (1981) (because reasonable expectation of being haled into a forum is determined by the forum's jurisdictional law, it cannot provide the standard for determining reasonableness of jurisdiction); Stephens, *Sovereignty and Personal Jurisdiction Doctrine: Up the Stream of Commerce without a Paddle*, 19 Fla.St.L.Rev. 105, 139–40 (1991) (same). As written, rather than as interpreted in the non-mass tort context, the statute provides a framework within which the jurisdictional problems of traditional and mass torts and other new forms of litigation may be efficiently resolved.

Cases holding that jurisdiction cannot be asserted where a product's contact with New York was only through the stream of national commerce and unintended by the manufacturer are not relevant to the present case. Each involved traditional tort suits by individual plaintiffs against individual providers of goods and services. *See, e.g., Schaadt*, 564 N.Y.S.2d at 865 (action by individual against manufacturer and distributor of meat packing machine); *Murdock*, 554 N.Y.S.2d at 888 (action by individual against retailer of defective chair); *Martinez*, 457 N.Y.S.2d at 98 (action on behalf of individual decedent against manufacturer and installer of air conditioner); *Prentice*, 437 N.Y.S.2d at 174 (action by individual and spouse against manufacturer of chain hoist); *Tracy*, 355 N.Y.S.2d at 651 (action on behalf of individual against manufacturer of contact lenses). *Hymowitz* is not a traditional tort case. It is the New York courts' response to what would otherwise be the intractable nature of the DES mass tort. Local businesses, or foreign businesses whose products normally have no contact with the United States, may arguably rely on the fact that they never expected to have any dealings that affect New Yorkers. But the same is not true of manufacturers of generic goods participating in a national industry and market.

Existing case law on section 302(a)(3)(ii) thus offers no direct guidance on the application of the "reasonable expectation" element to mass DES torts; precedent is here only a slight inhibitant against rational decisionmaking. *See* E. Hanks & S. Nemerson, *The Legal Process: Cases and Materials* Ch. 3, at 1–2 (temporary ed. 1992); *cf.* Goldberg, Note: *Community and the Common Law Judge: Reconstructing Cardozo's Theoretical Writings*, 65 N.Y.U.L.Rev. 1324, 1352 (1990) (describing Cardozo's concern that *stare decisis* not degenerate into "the tyranny of concepts"). The issue must instead be resolved in a manner consistent with the court's informed prediction of what the New York Court of Appeals would do when faced with the same issue. *DeWeerth v. Bal-*

*dinger*, 836 F.2d 103, 108 (2d Cir.1987), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988); *In re E. & S. Dists. Asbestos Litig.*, 772 F.Supp. 1380, 1390 (E. & S.D.N.Y.1991). That court has already gone to considerable lengths to adapt state substantive law to the particular circumstances of the DES cases. Moreover, *Hymowitz* itself drew a direct link between the jurisdictional and substantive components of DES litigation by imposing several, rather than joint and several, liability. *See Hymowitz*, 73 N.Y.2d at 512–13, 541 N.Y.S.2d 941, 539 N.E.2d 1069. New York law favors fully compensating plaintiffs for losses sustained. *See In re E. & S. Dists. Asbestos Litig.*, 772 F.Supp. at 1401. For mass torts involving numerous defendants, this result is usually achieved by the imposition of joint and several liability. *Id.* at 1400–03 (to fully compensate plaintiffs, New York General Obligations Law holds non-settling defendants jointly and severally liable for damages attributable to unreachable defendants). Given the *Hymowitz* court's decision to forgo joint and several liability, a DES plaintiff's full recovery would be frustrated if all manufacturers for pregnancy use could not be brought into court. *See Hymowitz*, 73 N.Y.2d at 521, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (Mollen, J., dissenting).

*Hymowitz* and the New York Civil Practice Law and Rules as well as legislative policy must thus be read as favoring a jurisdictional reach consistent with the national market share rationale and the adoption of several liability. A consonant interpretation of C.P.L.R. § 302(a)(3)(ii) supports the conclusion that any manufacturer of DES, by its participation in the national marketing of a generic drug, should "reasonably expect" its act of selling in the national market "to have," as C.P.L.R. 302(a)(3)(ii) puts it, "consequences in the state."

Even before *Hymowitz*, all DES manufacturers knew that their acts were having forum consequences in New York. All were competing to carve out local spheres of influence within the national DES market. Since the product was a generic, perfectly fungible consumer item, each manufacturer and distributor secured its market niche knowing that, by occupying this territory, other suppliers would have cause to look elsewhere to sell the same product. Moreover, the existence of the local markets depended upon the creation of a national DES market. Defendants' engagement in the national DES industry alerted them to the fact that their conduct in marketing generic DES in one part of the country would have economic and trade flow consequences in every other part, including New York. There was here a true national market encouraged and protected by the Commerce Clause of the federal Constitution and national drug regulations, not a series of discrete inward-looking and unrelated markets. Sales in any part of the national market had a necessary impact on every other part. *Hymowitz* simply marked the Court of Appeals' recognition that these features of the DES economy were relevant to the apportionment of liability among defendants.

The fact that DES manufacturers did not anticipate *Hymowitz* or the jurisdictional consequences flowing from that decision is not significant. The parties in this suit are governed by the substantive common law and jurisdictional law in effect at the time of the suit. *Linkletter v. Walker*, 381 U.S. 618, 626 n. 10, 85 S.Ct. 1731, 1736 n. 10, 14 L.Ed.2d 601 (1965) ("'A federal court sitting in a diversity case must ... apply the most recent state court decision, even if it came after the operative events....'") (citing Note, *Prospective Overruling and Retroactive Application in the Federal Courts*, 71 Yale L.J. 907, 915 (1962)). To the extent any defendant actually tailors its primary conduct to avoid appearing in certain fora, legal innovations like *Hymowitz* may undermine such efforts. The same holds true, however, of defendants' attempts to conform their primary conduct to substantive common law. Our legal system is at least as solicitous of defendants' attempts to comply with substantive law as it is of their ability to plan their activities so as to avoid jurisdiction. Yet changes in substantive common law routinely defy parties' expectations. *See, e.g., Great N.*

*Ry. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) (state court has discretion to determine whether to apply innovative decisions only prospectively or to the parties before it). Jurisdictional legislation is likewise exempt from the general rule that statutes be applied only prospectively. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 224, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957) (jurisdictional legislation is remedial and does not affect substantive rights; it may thus be applied to cases whose operative facts occurred prior to its passage); *Simonson v. International Bank*, 14 N.Y.2d 281, 290, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964) (C.P.L.R. § 302 must be applied retroactively: question of retroactivity determined exclusively by reference to legislative design).

In finding a reasonable expectation of forum consequences for all manufacturers of DES for pregnancy use, the law need not attribute a co-conspirator, agency or concerted action relationship among the manufacturers. *See In re North Dakota Personal Injury Asbestos Litig. No. 1*, 737 F.Supp. 1087, 1095–98 (D.N.D.1990) (out-of-state defendant amenable to jurisdiction where it was allegedly a member of a trade association that knowingly suppressed information about asbestos hazards in furtherance of a conspiracy to commit deceit and other members of the association sold asbestos in the jurisdiction); *Gudaitis v. Adomonis*, 643 F.Supp. 383 (E.D.N.Y.1986) (court may assert jurisdiction over defendant by attributing co-conspirator's acts in the forum to defendant); *Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dep't 1974) (defendant that by itself and through agents solicited business in New York should reasonably expect forum consequences). *But cf. Sage v. Fairchild–Swearingen Corp.*, 70 N.Y.2d 579, 587, 523 N.Y.S.2d 418, 517 N.E.2d 1304 (1987) (manufacturer of defectively designed product is liable for injuries caused by duplicate where (1) duplicate adheres to design of original and (2) plaintiff's use of duplicate was foreseeable). The language of *Hymowitz* in fact bars

this attribution. There the court noted that the

> drug companies were engaged in extensive parallel conduct in developing and marketing DES. There is nothing in the record, however, beyond this similar conduct to show any agreement, tacit or otherwise, to market DES for pregnancy use without taking proper steps to ensure the drug's safety.

73 N.Y.2d at 506, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (citation omitted). It is too late for plaintiffs to controvert this finding. The Court of Appeals reaffirmed *Hymowitz* in two recent opinions. *Rastelli v. Goodyear Tire & Rubber Co.*, 79 N.Y.2d 289, 582 N.Y.S.2d 373, 591 N.E.2d 222 (1992); *In re DES Market Share Litig.*, 79 N.Y.2d 299, 582 N.Y.S.2d 377, 591 N.E.2d 226 (1992). Even if factually unfounded—as plaintiffs contend—the policy is now settled New York law and all New York law must be adjusted to that policy. *See In re DES Cases*, 789 F.Supp. 548 (E.D.N.Y. 1992).

**B. Constitutionality of New York Statutes**

C.P.L.R. §§ 301 and 302(a)(3)(ii) must be applied in a manner that does not violate the federal Constitution. The issue is whether the Constitution limits the ability of New York state to provide full compensation to residents injured by a product sold in the national DES market.

### 1. Current Due Process Doctrine and Problems Raised by Its Application to Mass Torts

There is considerable doubt about the current existence of a unitary, coherent jurisdictional due process standard. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–78, 105 S.Ct. 2174, 2181–85, 85 L.Ed.2d 528 (1985) (listing alternative formulations); *see also, e.g.*, Borchers, *The Death of the Constitutional Law of Personal Jurisdiction: From* Pennoyer *to* Burnham *and Back Again*, 24 U.C. Davis L.Rev. 19, 73 (1990) (describing formulations in *Burger King* as "unwieldy"); Korn, *The Implications of* Burnham v. Superior Court *for the DeConstitutionaliza-*

*tion of Judicial Jurisdiction,* Address to the Faculty of Columbia Law School, Feb. 27, 1992 (on file) (discussing contradictions in current cases); McDougal, *Judicial Jurisdiction: From a Contacts to an Interest Analysis,* 35 Vand.L.Rev. 1, 8–13 (1982) (criticizing "minimum contacts" approach); Murphy, *Personal Jurisdiction and the Stream of Commerce Theory: a Reappraisal and a Revised Approach,* 77 Ky. L.J. 243, 270–72 (1988) (noting tensions in recent decisions); Stephens, *Sovereignty and Personal Jurisdiction, supra,* at 105–06, 122–23 (arguing that "stream of commerce" cases have created confusion).

One common feature of recent Supreme Court formulations is that a defendant must reasonably expect that its activity could result in litigation in the forum state. *See, e.g., Burger King,* 471 U.S. at 474, 105 S.Ct. at 2183 (defendant must "purposefully establish[ ] 'minimum contacts' in the forum State" so that " 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there' ") (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)). The Court has emphasized that this standard is ultimately designed to protect the liberty interests of defendants. *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702–03 n. 10, 102 S.Ct. 2099, 2104–05 n. 10, 72 L.Ed.2d 492 (1982).

The Court has, however, acknowledged other interests besides (1) the interest of a defendant in being able to predict the location of future litigation, namely (2) the forum state's interest in providing a convenient forum to its residents, (3) the plaintiff's interest in obtaining relief, (4) the state courts' interest in efficient resolution of disputes, and (5) the shared interests of the several states. These other interests have been described as "surrogate[s]" of defendants' underlying liberty interests. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984). Introduction of the "surrogate" interests into due process analysis complicates matters. Thus,

[a] State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed.

*Burger King,* 471 U.S. at 473–74, 105 S.Ct. at 2182–83 (citations omitted). Likewise, the determination of the reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors. A court must consider the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief. It also must weigh in its determination "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interests of the several States in furthering fundamental substantive social policies."

*Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987) (plurality opinion) (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980)).

The Supreme Court has never had occasion to balance this multiplicity of factors in a mass tort case involving parties from across the nation. The so-called "stream of commerce" cases—*World–Wide Volkswagen* and *Asahi*—appear to prevent the assertion of jurisdiction in traditional tort cases solely on the grounds that it was foreseeable to a defendant that its product might travel through the national or international economy and therefore might surface in any given jurisdiction. *See Asahi* 480 U.S. at 112, 107 S.Ct. at 1032 (plurality opinion). While some have suggested that *Asahi* is limited in applicability because it involved an indemnification action between two foreign corporations, the case has been given more general application. *See, e.g.,*

*Wiles v. Morita Iron Works Co.*, 125 Ill.2d 144, 125 Ill.Dec. 812, 816–17, 530 N.E.2d 1382, 1386–87 (1988) (under *Asahi*, jurisdiction lacking in tort suit against foreign manufacturer of "air cell former" machine); *Kohn v. La Manufacture Francaise Des Pneumatiques Michelin*, 476 N.W.2d 184, 187 (Minn.Ct.App.1991) (jurisdiction lacking in tort suit against foreign tire manufacturer); *Graham v. Machinery Distribution, Inc.*, 410 Pa.Super. 267, 599 A.2d 984, 987–88 (Pa.Sup.Ct.1991) (jurisdiction lacking in tort suit against foreign manufacturer of forklift); *Parry v. Ernst Home Center Corp.*, 779 P.2d 659, 668 (Utah 1989) (jurisdiction lacking in tort suit against foreign tool manufacturer); *cf. Humble v. Toyota Motor Co.*, 727 F.2d 709 (8th Cir.1984) (jurisdiction lacking over foreign car seat manufacturer). Thus applied, *Asahi*'s plurality rule is of dubious utility even in traditional litigation. *See, e.g.,* Stephens, *Sovereignty and Personal Jurisdiction, supra,* at 106; Weintraub, Asahi *Sends Personal Jurisdiction Down the Tubes,* 56 Tex.Int'l L.J. 55, 56 (1988).

The *Asahi–Volkswagen* approach is particularly pernicious in the advantage it gives to foreign producers whose goods enter the American common market. These firms can organize themselves to avoid jurisdiction in any state or federal court. *See Kohn,* 476 N.W.2d at 188 ("We recognize ... that denying jurisdiction allows a corporation to structure itself to avoid suit in foreign jurisdictions."). What should be an issue of venue—where in the United States a foreign manufacturer can be sued—is turned into a jurisdictional barrier to suit anywhere in the country. *But cf. Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322 (E.D.N.Y.1981) (asserting jurisdiction over Japanese company because of loyalty between company managers and management of United States subsidiary). Because jurisdictional due process allows many foreign manufacturers to circumvent the American courts altogether, United States residents often will be unable to avail themselves of the strong protections of American tort law. Foreign manufacturers also gain a competitive advantage.

In any event, neither *Volkswagen* nor *Asahi,* which both involved conventional product liability claims by individual plaintiffs, are controlling in DES mass torts brought under *Hymowitz* for the same reasons that the traditional New York tort cases interpreting the "reasonable expectation" element of C.P.L.R. 302(a)(3)(ii) are unhelpful in applying that statute to mass tort cases such as this one. As was pointed out above, mass torts raise unique problems of substantive, quasi-substantive, and procedural law that have just begun to receive the attention they require in federal and state courts and legislatures. The wooden application of inapt precedent will not effectively resolve these cases. As both *Burger King* and *Asahi* indicate, a careful weighing of the interests of the parties, the forum states, and the interstate system is required.

In their jurisdictional cast, DES mass tort cases perhaps most resemble *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Keeton, a New York resident, sued Hustler magazine for libel in New Hampshire. Jurisdiction in New Hampshire was predicated in the first instance on the defendant's distributing a small percentage of the allegedly offending publications in that state. Noting that the plaintiff had alleged injuries occurring in every state in the country, the Court focused its minimum contacts analysis on the issue of whether it would be " 'fair' to compel [Hustler] to defend a multistate lawsuit in New Hampshire seeking nationwide damages ... even though only a small portion of ... [the allegedly libelous] copies were distributed in New Hampshire." *Id.* at 775, 104 S.Ct. at 1478–79. In light of New Hampshire's interest in redressing the small percentage of national injuries that occurred in its state, *id.* at 776, 104 S.Ct. at 1479, and the several states' interest in the efficient adjudication of a national claim in a single forum, *id.* at 777, 104 S.Ct. at 1479, the Court found an assertion of jurisdiction constitutional despite the fact that the defendant had *de minimis* contacts and the plaintiff no con-

nection to the forum other than the lawsuit. *Id.* at 780, 104 S.Ct. at 1481.

Like considerations favor a finding that jurisdiction over the defendants in this case can be constitutionally asserted. *Hymowitz, Besser,* and the legislative modifications to New York's statutes of limitations for DES plaintiffs evince New York's intent to provide as full a recovery as is practicable to those of its residents injured by DES. New York and its residents therefore have a strong interest in the assertion of jurisdiction. Likewise, the several states share an interest in the efficient resolution of DES cases.

■■■ The fit with *Keeton* is not exact. In the present case, for example, some of the DES manufacturers cannot be said to have directly availed themselves of the forum state's market, whereas Hustler clearly did, albeit to a trivial extent. Still, by competing to establish a territorial niche within the national DES market, every manufacturer directly or indirectly benefited from the Commerce Clause of the federal Constitution and the laws of every state in the nation by participating in the national market for a generic good. In a sense, then, each DES manufacturer did "purposefully derive benefit from [its] interstate activities," such that none may be entitled to rely on the Due Process Clause "as a territorial shield to avoid interstate obligations that have been voluntarily assumed." *Burger King,* 471 U.S. at 473–74, 105 S.Ct. at 2183. Under the federal Commerce Clause and the substantive law of *Hymowitz,* the United States constitutes a common economic pond that knows no state boundaries. A substantial interjection of products at any point of the national market has ripple effects in all parts of the market.

The strain created in trying to accommodate jurisdictional issues raised by mass torts into the literal requirements of accepted formulations like "purposeful availment" suggests that modifications of jurisdictional law may be no less appropriate than modifications of substantive and quasi-substantive law already undertaken by state courts and legislatures. The standard jurisdictional formulations are, after all, the product of traditional cases which were not decided with mass litigation in mind. In this instance, at least, where substantive law has undergone significant development to accommodate socioeconomic change, it is necessary to interpret jurisdictional law so that it meets the demands of the subject matter of the litigation. *See, e.g.,* Erichson, Note: *Nationwide Personal Jurisdiction, supra,* at 1158 & n. 265 (noting recent scholarship discussing advantages of linking substantive and procedural law). The need for adaptation in this case is clearly indicated by the fact that, without it, these New York plaintiffs would likely be barred from recovering from these defendants in any court. If, for example, plaintiffs sought out the defendants in the California courts, California choice-of-law rules would probably call for the application of California substantive law. *See Bernhard v. Harrah's Club,* 16 Cal.3d 313, 128 Cal.Rptr. 215, 546 P.2d 719 (en banc) (adopting "comparative impairment of state interests" approach to choice-of-law issues), *cert. denied,* 429 U.S. 859, 97 S.Ct. 159, 50 L.Ed.2d 136 (1976). The defendants could then obtain a dismissal under *Sindell* by proving that they did not market DES in New York.

The Supreme Court itself has suggested the need for modified jurisdictional analysis in the special context of mass litigation. In the *Shutts* case, the Court confronted the issue of whether the Kansas state court had jurisdiction to bind each of the almost 30,000 plaintiff class members located around the country without requiring a showing of minimum contacts between each member and Kansas. *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Noting the necessity of the national class action device to provide relief where it might otherwise be unattainable, Chief Justice Rehnquist wrote that "minimum contacts" analysis was inapplicable and that, instead, a lower standard of "minimal procedural due process protection" was sufficient. *Id.* at 811–12, 105 S.Ct. at 2974. This standard requires only (1) best practicable notice and an opportunity to be heard, as defined by

*Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); (2) a right to opt out of the litigation and (3) a showing that the named plaintiff(s) adequately represent absent class members. *Id.* 472 U.S. at 812, 105 S.Ct. at 2974. By this formula, the Court essentially employed the time-honored jurisdiction-stretching technique of implied consent to cope with the special problem of jurisdiction in mass class actions: plaintiffs who received notice and did not opt-out were deemed to have implicitly consented to jurisdiction. *See* Miller & Crump, *Jurisdiction and Choice of Law in Multistate Class Actions After* Phillips Petroleum Co. v. Shutts, 96 Yale L.J. 1, 16–17 (noting Court's reliance on fiction of implied consent).

Similar modifications are necessary in the DES context. Although the *Shutts* opinion stressed that its treatment of the plaintiff class did not necessarily apply to defendants or defendant classes, *see Shutts,* 472 U.S. at 808–11 & 811–12 n. 3, 105 S.Ct. at 2972–74 & 2974–75 n. 3, the difficulties raised by mass litigation and the present case warrant a restatement of jurisdictional due process law that can function in this and other mass torts.

### 2. Case Law in Non–Mass Torts

The federal and state courts have been wrestling with the jurisdictional requirements of the Due Process Clause for 125 years. Although this area of law has necessarily responded to technological, social and economic change, its evolution has been halting and uncertain. Whereas the realization of the national economy all but compelled a genuine revolution in the substantive constitutional law of the Commerce and Due Process Clauses, a similarly complete transformation in the more rarefied realm of jurisdictional due process law has not been completed. The vocabulary of jurisdiction has changed—"presence" and "implied consent" have given way to "minimum contacts" and "purposeful availment." But these changes have not yet achieved complete clarity and coherence. Rather, the courts continue to function with an apparatus of concepts that recog-

nizes, but does not quite systematize, the competing interests of defendants, plaintiffs, the courts, the individual states as sovereigns and the interstate system.

At the center of the problem is the idea that the Due Process Clause forbids a state legislature from empowering the state's courts to adjudicate cases against defendants having no territorial nexus with the state. The longevity of this idea has been remarkable. Since it first surfaced in *Pennoyer v. Neff,* it has been continuously attacked. A legion of commentators and judges have demonstrated that the mid-nineteenth century territorial nexus requirement needs modification for end-of-twentieth century litigation. The growing interconnectedness of the national economy and increased social mobility often have rendered the requirement unworkable in its original form.

As much as they might like to, however, the lower courts cannot simply abandon such well-entrenched doctrine in developing a due process standard for mass torts. *Cf.* Stephens, *Sovereignty and Personal Jurisdiction, supra,* at 133 (Supreme Court's continuing reliance on inquiry into "sovereignty" component of jurisdictional law cannot properly be ignored); Stein, *Styles of Argument and Interstate Federalism in the Law of Personal Jurisdiction,* 65 Tex.L.Rev. 689, 734–48, 761 (1987) (same). The current task in this area is instead to clarify the role that the nexus requirement plays in Due Process Clause jurisprudence for cases reflecting new substantive law.

### a. Pennoyer and Its Problems

The territorial nexus requirement is the child of *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877). In that case the Supreme Court invalidated a default judgment against Neff on the ground that Oregon could not assert personal jurisdiction over a person not present in the state absent that person's consent. The Court suggested that the Due Process Clause of the fourteenth amendment required such a result. *Id.* 95 U.S. at 733. *But see* Borchers, *The Death of the Constitutional Law of Personal Jurisdiction, supra,* at 38–43 (argu-

ing that *Pennoyer* required only that absent defendants be served according to the terms of existing state statutes).

*Pennoyer*'s conclusion that presence and consent are the only bases for jurisdiction was supported by two arguments. Both of these arguments focused in the first instance not on the liberty and property interests of absent defendants, but rather on the limited power of sovereign states within a federal system. Although neither of these arguments is particularly compelling, the focus of both on the limited nature of state sovereignty identifies what was to become a perennial concern of the courts.

The first, more familiar, argument purports to base the result in *Pennoyer* on principles of international comity. In the words of Justice Field:

> The several States are of equal dignity and authority, and the independence of one implies the exclusion of power from all others. And so ... the laws of one State have no operation outside of its territory, except so far as is allowed by comity; and ... no tribunal established by it can extend its process beyond that territory so as to subject either persons or property to its decisions.

*Pennoyer*, 95 U.S. at 722. The problem with this argument is that legislation pertaining to the ability of a state court to render judgments effective in that state is properly viewed—and apparently has been viewed since the time of the Magna Carta—as an entirely domestic exercise of power that does not raise comity concerns. *See generally* Whitten, *The Constitutional Limitations on State–Court Jurisdiction: A Historical–Interpretative Reexamination of the Full Faith and Credit and Due Process Clauses* (pt. 2), 14 Creighton L.Rev. 735 (1981) (arguing that *Pennoyer*'s introduction of comity concerns into the meaning of "due process" marked a radical departure from traditional usage). Justice Field seems to have suggested as much in an earlier case. *See Galpin v. Page*, 85 U.S. (18 Wall.) 350, 368–69, 21 L.Ed. 959 (1873); Borchers, *The Death of the Constitutional Law of Personal Jurisdiction, supra*, at 32 (arguing that *Galpin*

recognized the legitimacy of extraterritorial reach of state jurisdictional legislation). By authorizing jurisdiction over non-resident defendants, state legislatures are not usurping or disrespecting the power of other sovereigns; they are establishing internally effective jurisdictional rules. Whether other states are required to give such judgments full faith and credit had, until *Pennoyer*, been treated as a separate question.

The second argument in *Pennoyer* stems not from a purported concern for comity, but rather from a concern for its opposite: realpolitik. To use Justice Field's effective imagery, "[p]rocess from the tribunals of one State cannot run into another State, and summon parties there domiciled to leave its territory and respond to proceedings against them." 95 U.S. at 727. Since state legislatures could not realistically ensure the production of absent defendants, the Court seemed to suggest, the Due Process Clause would save them the trouble by preventing the assertion of jurisdiction over those defendants.

This justification of the result in *Pennoyer* is untenable for many reasons. Its rationale would prevent legislatures from providing for jurisdiction over residents who were temporarily absent from the state. More generally, the idea that due process limits a state legislature's authority to the scope of its *de facto* physical power would leave states unable to provide basic protections to their residents. The Constitution could not reasonably be read to require states to suffer in silence while absent defendants played havoc with their residents.

The interesting feature of *Pennoyer*'s two arguments is that, at least on the surface, they bear little connection to due process. Justice Field's interest was the theoretical basis for states' power to authorize judgments. The traditional due process concerns—whether the defendant will suffer a deprivation of liberty or property without fair notice and a reasonable opportunity to defend—are at best only tangentially related to these sovereignty concerns. If a state court judgment

against a non-resident defendant who had a genuine opportunity to mount a defense is in some sense *ultra vires*, it is not at all obvious that its illegitimacy amounts to the absence of due process.

This was the point of Justice Hunt's *Pennoyer* dissent, which rejected the idea that the Due Process Clause provides any limitation on assertions of jurisdiction beyond the requirement of notice and opportunity to be heard.

> It belongs to the legislative power of the State to determine what shall be the modes and means proper to be adopted to give notice to an absent defendant of the commencement of a suit; and if they are such as are reasonably likely to communicate to him information of the proceeding against him, and are in good faith designed to give him such information, and an opportunity to defend is provided for him in the event of his appearance in the suit, it is not competent to the judiciary to declare that such proceeding is void as not being by due process of law.

*Pennoyer*, 95 U.S. at 737 (Hunt, J., dissenting).

Despite purporting on several occasions to reject *Pennoyer* in favor of a due process analysis focusing exclusively on the liberty and property interests of absent defendants, the Supreme Court has never adopted Justice Hunt's view. This fact is of great significance. From 1877 forward, the courts were forced to expend considerable effort to sustain *Pennoyer* in the face of historical developments that had rendered its holding obsolete. By the time of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court was apparently sufficiently frustrated to want to pull the plug on sovereignty-based theories of personal jurisdiction and replace them with a conceptually independent fairness analysis that examined only the burdens that assertions of jurisdiction place on particular defendants. In that period of constitutional history, moreover, the Court was bent on abandoning other substantive due process restraints on state legislative activity.

Still, the Supreme Court did not find its way to completely abandoning the sovereignty inquiry started in *Pennoyer.* Likewise, subsequent pronouncements of the death of the "sovereignty" component in the due process inquiry have proved greatly exaggerated. From *Pennoyer* to the present day, due process has always required the plaintiff to demonstrate the forum state's authority to support an assertion of extraterritorial jurisdiction. *International Shoe* eventually endorsed a separate inquiry, already evidenced in the prior case law of "presence" and "implied consent," which focuses on a defendant's interest in not being unduly burdened in presenting its case. This fairness inquiry, however, supplemented, rather than supplanted, *Pennoyer*'s sovereignty inquiry.

The salient feature of the history of the two independent inquiries into sovereignty and fairness is that, when they made their formal debut together in *International Shoe*, they *both* imported *Pennoyer*'s territorial nexus requirement. Under *International Shoe*, it is only when a non-resident defendant's contacts with a state reach a certain level that the state has *authority* to assert jurisdiction over that defendant. Likewise, with respect to the fairness inquiry, *International Shoe* and subsequent cases have considered it *unfair* to assert jurisdiction over a defendant unless that defendant has conducted certain activity in the forum state.

Recognizing that a territorial nexus requirement has crept into both the sovereignty and fairness components of the constitutional law of personal jurisdiction provides a conceptual basis from which to develop a set of standards that is both workable in the context of mass litigation yet respectful of the traditional incorporation of a nexus requirement. Two additional steps are required. First, it must be understood that a nexus requirement makes a good deal more sense as a component of the sovereignty inquiry than it does as a part of the fairness inquiry. This explains why, despite longstanding criticism to the contrary, some kind of nexus requirement has been retained in the constitutional law of personal jurisdiction.

The second step requires recognizing that *Pennoyer*'s requirement of a *territorial* nexus mistook an instance of a theory of sovereignty for the theory itself. In other words, while *Pennoyer* and *International Shoe* were both correct to include a nexus requirement as part of the sovereignty inquiry, they need not have required a *territorial* nexus as the basis for assertions of jurisdiction. As subsequent cases have implicitly established, the nexus requirement is satisfied so long as a state has a tangible interest in litigation arising out of a nonresident defendant's acts, whether or not those acts occurred within the state.

With the accommodation of nexus concerns entirely within the sovereignty branch, and the severance of territorial notions from the more general concerns behind the nexus requirement, a more reasonable and systematic accommodation of the interests of parties, the forum state, and the other states is possible. To establish its contours requires a brief recounting of the well-travelled history of personal jurisdiction.

b. *Pennoyer* to *International Shoe:* The Emergence of Fairness Inquiry

From its inception, *Pennoyer* was awkward in application. Corporations had engaged in substantial interstate commerce since before the Civil War. These corporations were deemed to exist (and therefore to be present) in their state of incorporation. Insofar as they chose not to consent to jurisdiction elsewhere, they were, by a literal reading of *Pennoyer*, invulnerable to state court actions outside of their home state. The reality of interstate activity thus necessitated the invention of expanded notions of "presence" and "consent." The courts' use of these doctrines eventually raised theoretical complexities that pointed toward the development of an alternative "fairness" doctrine that promised to replace, but ultimately only modified, *Pennoyer*.

From before the time of *Pennoyer*, the Supreme Court had held that a state legislature was entitled to extort "consent" to jurisdiction as a condition of a foreign corporation's doing business in the state. *See Lafayette Ins. Co. v. French*, 59 U.S. (18 How.) 404, 407, 15 L.Ed. 451 (1855). The usage of "consent" in this context was disingenuous. The assertion of jurisdiction in these instances was clearly based on the power of the states to exact obedience to their jurisdictional laws because of their status as sovereign nations with the right to control their borders and activity within their borders. *See id.* (proper for state to "compel" foreign corporation to designate agent for service of process).

The assumption that a state had the power to exclude corporations or other entities created in other states was and is incompatible with the commercial nation envisioned under the Commerce Clause, which was meant to permit businesses to roam at will through the common United States market without discriminatory inhibition. *See Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 6 L.Ed. 23 (1824). Within ten years, the premise of *Lafayette* was in any event put to rest as a practical matter by the victorious armies of the federal government. The Court conceded as much when, at the time of *Pennoyer*, it held that the states were powerless to exclude foreign corporations from conducting interstate commerce. *Pensacola Tel. Co. v. Western Union Tel. Co.*, 96 U.S. 1, 24 L.Ed. 708 (1877). The Court apparently did not immediately recognize that such a substantive law holding undermined *Lafayette*. *See* Kurland, *The Supreme Court, the Due Process Clause and the In Personam Jurisdiction of State Courts*, 25 U.Chi.L.Rev. 569, 581 (1958).

Two alternative doctrines for establishing jurisdiction—"corporate presence" and "doing business"—avoided the problem of *Lafayette* but raised theoretical problems of their own. By these doctrines, absent corporations were treated as present (or, as it was later called, doing business) if they conducted enough of the right sort of activity in the forum state and were therefore deemed amenable to what is now called "general" jurisdiction. *See id.* at 583–84.

The problem of presence theory, which recently resurfaced in *Burnham v. Superior Court*, 495 U.S. 604, 110 S.Ct. 2105, 109

L.Ed.2d 631 (1990), is that it seems to grant each state too much, rather than too little, jurisdictional reach. Given the premises of *Pennoyer*, even fleeting presence was sufficient to support general jurisdiction for all causes of action. In theory, a corporation, which is comprised of the actions of the natural persons who act on its behalf, is "present" wherever any of its officials are even transitorily involved with corporate business. *See Hutchinson v. Chase & Gilbert, Inc.*, 45 F.2d 139, 141 (2d Cir.1930) (L. Hand., J.) (corporation "must be equally present wherever any part of its work goes on, as much in the little as in the great"). Thus non-resident corporations should have been amenable to general jurisdiction for transient forum activities.

The courts steadfastly resisted the idea of transient corporate presence by requiring more than a minimal quantum of in-state activity by corporate officers and agents. *See* Kurland, *The Due Process Clause and In Personam Jurisdiction, supra*, at 582–86 (describing application of presence and doing business doctrines). But to the extent they did so, it was on the basis of independent fairness concerns that did not derive from the premises of presence theory. As Judge Learned Hand famously noted, courts that engaged in these analyses were using territorial contacts as indices of the reasonableness of haling absent defendants into court despite the fact that there were many instances in which there was little or no correlation between the existence (or non-existence) of a territorial nexus and the fair (or unfair) treatment of defendants. *Hutchinson*, 45 F.2d at 142.

After *Pennoyer*, the courts also made use of "implied consent" doctrine to support "specific" jurisdiction. *See* Kurland, *The Due Process Clause and In Personam Jurisdiction, supra*, at 578–82. For example, Justice Field, concerned in *Pennoyer* about the unfairness of asserting jurisdiction over absent natural persons, was quite willing to find that absent corporations that conducted business in a forum had implicitly consented to jurisdiction for causes of action arising from that business. *St.*

*Clair v. Cox*, 106 U.S. 350, 356, 1 S.Ct. 354, 27 L.Ed. 222 (1882).

The use of the term "consent" in this context was also disingenuous—and ambiguously so. Implied consent theory amounted to conceptual "fudging": it incorporated at least three distinct ideas, two concerning sovereignty, and one concerning fairness to defendants.

The first sovereignty argument in "implied consent" theory was a presence argument. On this view, implied consent doctrine allowed the state courts to exert jurisdiction over corporations whose activities rendered them "present" in the forum. This idea raised the problem of potentially too-expansive jurisdiction associated with corporate presence and doing business doctrine.

The roots of implied consent theory could also be found in a theory of sovereignty that substituted "interest" for "presence" analysis. The interest theory, which later resurfaced in *International Shoe*, starts from the premise that states may impose certain obligations on individuals to protect the well being of their citizens and their own policies. It follows that, where a non-resident defendant has voluntarily undertaken certain acts affecting residents or policies of the state, the state may impose an obligation on the non-resident to defend suits in that forum which arise from those acts.

Although there is an element of voluntariness in this theory—the defendant chooses to undertake certain acts—the basis for the obligation to defend in the forum state is not its voluntary assumption by the defendant. Presumably many defendants would choose to undertake acts with forum consequences without accepting such an obligation. Instead the notion is that states possess the authority to set the terms under which nonresidents may choose to act if those acts affect state interests.

The final element of implied consent theory was the same notion of fairness identified in the presence and doing business cases. As in those cases, implied consent doctrine used the existence of a forum nexus as a benchmark for fairness on the idea

that those non-resident defendants that availed themselves of particular fora would be the same defendants that were able to mount meaningful defenses in those fora.

In the period between *Pennoyer* and *International Shoe*, then, the tenable theories of general and specific jurisdiction were viable only because they smuggled in an expanded "interest" theory of sovereignty and an independent fairness limitation not rooted in the notions of power and consent which *Pennoyer* had read into the Due Process Clause. For this reason, the courts' efforts to sustain *Pennoyer* amounted to a form of limited chemotherapy designed to stem, but not cure, a jurisdictional cancer. By using presence, doing business, and implied consent, the courts mitigated the worst features of the disease for a time, but they never cured the underlying problem and the treatment engendered debilitating conceptual side effects.

### c. *International Shoe:* Sovereignty, Fairness and Nexus Requirements

Along with other doctrines implicating federalism and interstate commerce concerns, the issue of state court civil jurisdiction came to a head in the 1930s and 1940s. Like its siblings in substantive Due Process and Commerce Clause jurisprudence—*see, e.g., West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937); *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941)—*International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) promised to clear away the nineteenth-century theoretical underbrush and set the constitutional law of personal jurisdiction on a course required by the national economy. It was, however, less successful than its substantive law counterparts in achieving this goal.

Parts of *International Shoe* did suggest a genuine transformation. Its use of the phrase "traditional notions of fair play and substantial justice," borrowed from *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940), suggested that the Court had abandoned sovereignty inquiry altogether, as well as the territorial nexus component of fairness inquiry, in favor of an independent analysis of the conditions under which it would be fair to oblige a defendant to litigate in a foreign forum. *See* Redish, *Due Process, Federalism, and Personal Jurisdiction, supra*, at 1117. Such an interpretation was supported by *Milliken*, in which the Court focused its due process analysis exclusively on the adequacy of notice and defendant's opportunity to be heard, apparently without concern for the absent defendant's presence or contacts. 311 U.S. at 463, 61 S.Ct. at 342. Likewise, later cases, particularly *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)—which recognized the need to interpret the law of personal jurisdiction in light of the "fundamental transformation of our national economy"—downplayed both territorial and convenience concerns. *Id.* at 222–23, 78 S.Ct. at 200–01.

*International Shoe* did not, however, completely free itself of *Pennoyer* and post-*Pennoyer* complications. Its test brought to the fore, but did not resolve, the conflicting ideas buried in implied consent doctrine. Thus, in formulating the new due process standard, Chief Justice Stone, writing for the Court, continued the traditional emphasis on a defendant's activities within the forum state:

[the Due Process] clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. *Cf. Pennoyer v. Neff, supra; Minnesota Commercial Assn. v. Benn*, 261 U.S. 140 [43 S.Ct. 293, 67 L.Ed. 573 (1923) ].

But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protections of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought

to enforce them can, in most instances, hardly be said to be undue.

*International Shoe*, 326 U.S. at 319, 66 S.Ct. at 160.

The language in these two paragraphs and the citation to *Pennoyer* indicate the Court's retention of a sovereignty inquiry. The language of the second paragraph then intermingles the two different ideas of sovereignty that were implicit in implied consent doctrine. On the one hand, it states an "interest" analysis: states have the authority to attach obligations to the voluntary acts of defendants having an effect on the interests of the state. On the other hand, the interest analysis appears in a peculiarly narrow form because it retains elements of presence doctrine. Thus, a state only obtains the right to impose obligations on a defendant to defend suits arising from its acts if the acts occurred within the state. The Court does not explain why the state's ability to impose these obligations stops at its borders when many out-of-state acts undoubtedly have consequences sufficient to give the state an interest, if one be needed, to support imposition of such obligations. The narrow breadth of the rule of *International Shoe*, like that of many "landmark" cases, is perhaps only explicable in terms of the factual situation confronting the Court. The defendant corporation was conducting substantial activities in Washington and thus Chief Justice Stone was not forced to reckon with a case involving out-of-state activities having forum consequences.

Justice Black, recognizing that *"at the very least,* [a state] has power to tax and sue those dealings with its citizens within its boundaries ...," *id.* at 323, 66 S.Ct. at 162 (opinion of Black, J.) (emphasis added), presciently admonished the *International Shoe* Court to "decline the invitation to formulate broad rules as to the meaning of due process ... 'in advance of the necessity for its decision.'" *Id.* at 322, 66 S.Ct. at 161 (quoting *Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945)). Taking up the banner of Justice Hunt's dissent in *Pennoyer*, Justice Black reiterated the idea that due process at most required that state jurisdictional laws provide defendants with notice and an opportunity to be heard. *See id.* 326 U.S. at 324–25, 66 S.Ct. at 162–63.

By maintaining that a kind of attenuated presence was necessary before a state could claim an interest sufficient to allow it to oblige non-resident defendants to appear in the state's courts, *International Shoe* failed to resolve the conceptual difficulties underlying the sovereignty components of implied consent theory. Similarly, it continued the practice of importing territorial nexus concerns into fairness analysis. This was the upshot of linking "minimum contacts" to "traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158. By focusing on "contacts," the Court gave a signal to the states that the territorial nexus requirement would be satisfied in an expanded range of cases. But the shift from the requirement of actual presence to the requirement of minimum contacts liberalized, without liberating, the fairness component of the constitutional law of personal jurisdiction.

The tension between the lineage and aspirations of *International Shoe* soon manifested itself in case law. Six months after *McGee*, for example, the Court in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), limited the reach of Florida's courts, which had exercised jurisdiction over a trust created in Delaware by a settlor who had moved to, and died in, Florida. Ignoring the practical administrative concerns of Florida, which probated the settlor's will, the Court found protection of the non-Florida trustee's and beneficiaries' due process interests imperative. Justice Black again dissented, essentially on the grounds stated in his *International Shoe* opinion. *See id.* at 256, 78 S.Ct. at 1241 (Black, J., dissenting). Unlike in *McGee*, the majority opinion in *Hanson* paid scrupulous attention to the language in *International Shoe* that linked the sovereignty and fairness inquiries to the level of a defendant's in-forum activity, noting that

it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Id.* at 253, 78 S.Ct. at 1240.

*Hanson* was then adopted in support of the still more restrictive approach in the "stream of commerce" cases. In *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), the defendants' knowledge that a consumer who purchased an automobile in New York might drive the car to Oklahoma was deemed insufficient to establish minimum contacts with the latter state. While conceding that "[t]he historical developments noted in *McGee* ... have only accelerated in the generation since that case was decided," *id.* at 293, 100 S.Ct. at 565, the Court nevertheless invoked *Hanson*'s "purposeful availment" standard, adding to it the requirement that the defendant foresee being haled into the forum state's courts. *Id.* at 297, 100 S.Ct. at 567. Subsequently, in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a plurality of the Court stated that placement of a product in the stream of commerce is not sufficient to establish personal jurisdiction absent "[a]dditional conduct" indicating "an intent or purpose to serve the market in the forum State." *Id.* at 112, 107 S.Ct. at 1032. This test apparently was intended to add constraints even beyond those of *Volkswagen*, since Justice White, the author of *Volkswagen*, joined Justice Brennan's *Asahi* opinion concurring only in the result.

In the period since *International Shoe*, the Court has thus followed the letter of that opinion's fairness inquiry by consistently reiterating the territorial nexus element of that inquiry. During the same period, the Court has confronted, put to death and then resurrected sovereignty inquiry. As reincarnated, sovereignty inquiry still contains a version of the nexus requirement ratified in *International Shoe*. In this context, however, *International Shoe* has not been applied literally: the inquiry has shifted from a territorial to an interest nexus analysis.

Interest nexus analysis appeared in some early cases. In establishing the modern standards for notice and opportunity to be heard, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), appeared to predicate personal jurisdiction over nonresident defendants only on New York state's interest in fully and finally determining the interests of all claimants to a trust. *See id.* at 313–14, 70 S.Ct. at 656–57. In *McGee*, the Court found California's assertion of jurisdiction was at least in part supported by the state's "manifest interest" in protecting those of its citizens seeking payment on insurance claims. 355 U.S. at 223, 78 S.Ct. at 201.

The existence of an independent sovereignty inquiry—and with it, the propriety of interest analysis—was formally acknowledged in *World-Wide Volkswagen*, *see* 444 U.S. at 291–92, 100 S.Ct. at 564–65. The acknowledgment was then retracted in *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, see* 456 U.S. 694, 702–03 n. 10, 102 S.Ct. 2099, 2104–05 n. 10, 72 L.Ed.2d 492 (1982). The retraction, however, was not complete. Cases after the alleged "death" of sovereignty inquiry consistently maintain that the forum state's interest in a litigation is crucial to the jurisdictional determination. *See Asahi*, 480 U.S. at 113, 107 S.Ct. at 1032; *Burger King*, 471 U.S. at 473–74, 105 S.Ct. at 2182–83; *Keeton*, 465 U.S. at 776, 104 S.Ct. at 1479. The result, as noted above, has been some confusion as to the proper relation between the various concerns underlying the sovereignty and fairness inquiries.

### 3. *Sovereignty and Fairness in Mass Torts*

Two aspects of the constitutional case law of personal jurisdiction must be reemphasized.

The first is that the cases continue to rely on two distinct inquiries—sovereignty and fairness. Furthermore, both the sover-

eignty and fairness inquiries have required some connection between the forum state and the defendant. The Supreme Court's fairness inquiries have retained the traditional requirement of a physical, *territorial* nexus: a non-resident defendant will be constitutionally subject to state assertions of jurisdiction only if it voluntarily commits acts within the state. By contrast, the Court's sovereignty inquiry now requires only an *interest* nexus: so long as the non-resident defendant's acts give rise to a forum interest, the state has authority to assert jurisdiction.

The second feature of note is that this jurisprudence of jurisdictional due process has been developed in cases almost all of which involved one or a few parties on each side. The Supreme Court's two-pronged inquiry has never been articulated in the context of a mass tort case arising out of the national (or international) marketing of a product. Only in *Shutts* has the Court dealt with this type of case, and there it was prepared to stretch prevailing jurisdictional standards by reliance on an implied consent theory.

This pair of considerations bears directly on the Due Process Clause standard appropriate to mass torts. The issue is whether the sovereignty and fairness inquiries legitimately can be adapted to such cases.

■■■ Analysis of this issue starts from the recognition that incorporation of forum nexus concerns into the sovereignty and fairness inquiries must be regarded, at least in the first instance, as an historical accident. As noted above, *Pennoyer*'s initial adoption of territorial notions of sovereignty was dubious even when enunciated. *See* Whitten, *The Constitutional Limitations on State–Court Jurisdiction, supra.* Without considering the impact on the then largely unforeseen phenomenon of mass torts, the *International Shoe* Court reaffirmed the use of both of these notions. Whereas there is a plausible rationale for the continued reliance on the "forum state interest" component to the sovereignty inquiry, the territorial nexus requirement is, at least in mass tort cases, an unnecessary

and debilitating element of the fairness inquiry.

The notion that a forum state ought to have an interest in litigation before asserting jurisdiction over the parties is based on the idea that a state may not impose obligations on nonresidents without a reason. Although "under our constitutional system, the inquiry is not why *should* a state be allowed to take an action, but why *shouldn't* a state be allowed to do so," Redish, *Due Process, Federalism and Personal Jurisdiction, supra,* at 1134 (emphasis in original), the Due Process Clause does require that state law concerning economic and social welfare regulation be at least minimally rational. *See generally* L. Tribe, *American Constitutional Law* § 8–7, at 582–83 (2d ed. 1988) (post *Lochner*-era cases require only that state legislation not be "a display of arbitrary power") (quoting *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976)). In this instance, due process imposes the very narrow limitation that a state have at least some interest in a controversy before it may demand that a nonresident incur the burden of defending a suit in the state.

By contrast, territorial nexus doctrine is a particularly inadequate mechanism for protecting mass producers from undue litigation burdens. Examples of the poor fit between territorial nexus and fairness are staples of first-year Civil Procedure. The lack of a territorial nexus is often no indication of inconvenience: a Canadian company located in Willard, Ontario with no New York contacts will be much less physically inconvenienced by appearing in a court in Buffalo in the Western District of New York than a Buffalo resident would be when appearing in Brooklyn in the Eastern District of New York. The presence of a territorial nexus is an equally poor index of convenience, as the reinvigoration of "tag" or "transient" jurisdiction in *Burnham* has made clear. At least one wise observer of procedural law has suggested that the extreme disjunction between territorial nexus and convenience concerns evidenced in *Burnham* will result in the outright elimination of nexus concerns from the constitu-

tional law of personal jurisdiction. *See* Korn, *The De–Constitutionalization of Judicial Jurisdiction, supra.*

The political experience of the European Community also demonstrates that the territorial nexus requirement is by no means necessary to protect defendants' liberties within a federal system of government. Under European jurisdictional rules, for example, a citizen of Germany sustaining injuries in that country from a product manufactured by a British company in Britain may bring suit in Germany even in a traditional, single plaintiff, single defendant action. *See Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters,* Tit. II, Sec. 2, art. 5(3) (plaintiff may sue in "the courts for the place where the harmful event occurred"), *reprinted in* A. Lowenfeld, *Conflict of Laws: Documentary Materials—Federal, State, and International* 49 (1986). There is no indication that this aspect of the jurisdictional system is dysfunctional or works inequities on defendants. *See generally* Juenger, *Judicial Jurisdiction in the United States and in European Communities: A Comparison,* 82 Mich.L.Rev. 1195 (1984).

As critics of the territorial nexus standard have long noted, protection for defendants appearing in federal court is already provided in the law of venue and *forum non conveniens. See, e.g., Burnham v. Superior Court,* 495 U.S. 604, 639 n. 13, 110 S.Ct. 2105, 2125 n. 13, 109 L.Ed.2d 631 (1990) (Brennan, J., concurring in result). 28 U.S.C. §§ 1404(a) & 1406(a) allow district courts to transfer or dismiss civil actions when "in the interest of justice." Similarly, a court may, in applying *forum non conveniens* doctrine, "weigh relative advantages and obstacles to fair trial." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).

The oddity of the territorial nexus requirement will only become more evident in time. In the first place, the development of transportation and particularly communications technology—which, for example, allows courts to receive voluminous briefs in minutes by facsimile machine and to conduct hearings by telephone and soon by satellite video transmissions—continues to "shrink" the country.

Second, it seems likely that the phenomenon of mass litigations will continue to grow, and it is in these cases that the irrationality of the territorial nexus requirement is arguably most evident and the need for an improved approach most urgent. Mass tort suits typically are brought against groups of corporate defendants. In these cases the intuition linking territorial and convenience concerns—that a defendant in a civil case must travel to the forum to defend him-, her- or itself—is factually least plausible. As a rule, local counsel rather than defendants appear for motion and trial practice. Discovery need not and often will not take place in the forum. In federal court, moreover, discovery is subject to Federal Rule of Civil Procedure 26(b)(1)(iii), which now requires the district courts to take account of burdens on the parties in setting discovery parameters. As of the Rule's amendment in 1983, the courts must consider "the needs of the case, the amount in controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation."

The actual litigation costs per case of defendants in mass cases is also likely to be lower than the costs to defendants appearing alone. To the extent permitted by professional ethical rules, defendants often can cooperate to defray costs by effecting a division of labor. Even where defendants do not explicitly cooperate, in many mass cases some defendants will rely on the work of the defendants with the greatest potential exposure in the case and therefore the greatest interest in litigating effectively. In almost all mass torts, much of the cost of litigation is eventually paid by national insurance companies.

While the need for territorial nexus-based protections of defendants is arguably least pressing in mass torts, the continued reliance on such protections creates significant obstacles to their resolution. This is particularly evident in a case such as the instant one, where New York substantive

law empowers plaintiffs to bring in all industry participants to achieve a full and economical resolution of their lawsuits, yet jurisdictional law may prevent the very result envisioned by the state's substantive, remedial and procedural laws.

### 4. Due Process Standard for Mass DES Torts

 Given that New York law has evolved to promote the efficient resolution of mass DES torts, and given the problems of applying prevailing traditional jurisdictional concepts to such cases, a modification of established standards to determine the constitutionality of jurisdictional statutes that incorporates an interest nexus inquiry but not a territorial nexus inquiry is necessary in the DES context—and perhaps in other mass tort cases. The following pair of principles results from a conservative view of precedents. (Obviously, a more radical position eliminating the state interest requirement, thus allowing a neutral forum to accept jurisdiction, could be developed were the Supreme Court to revisit precedent.)

I. The court must first determine if the forum state has an appreciable interest in the litigation, i.e., whether the litigation raises issues whose resolution would be affected by, or have a probable impact on the vindication of, policies expressed in the substantive, procedural or remedial laws of the forum. If there is an appreciable state interest, the assertion of jurisdiction is *prima facie* constitutional.

II. Once a *prima facie* case is made, the assertion of jurisdiction will be considered constitutional unless, given the actual circumstances of the case, the defendant is unable to mount a defense in the forum state without suffering relatively substantial hardship.

Evidence to be considered in determining the defendant's relative hardship includes, *inter alia,* (1) the defendant's available assets; (2) whether the defendant has or is engaged in substantial interstate commerce; (3) whether the defendant is being represented by an indemnitor or is sharing the cost of the defense with an indemnitor or co-defendant; (4) the comparative hardship defendant will incur in defending the suit in another forum; and (5) the comparative hardship to the plaintiff if the case were dismissed or transferred for lack of jurisdiction.

It must be emphasized that this standard is designed only to establish the minimum due process requirements for assertions of jurisdiction absent a defendant's consent. Considerations such as parties' and witnesses' convenience, administrative practicalities, and interstate comity concerns may still counsel against exercising that jurisdiction. Convenience and administrative feasibility are, of course, standard criteria for deciding motions to transfer or dismiss for improper venue or *forum non conveniens.* Interstate comity concerns would be raised, for example, if a state court has jurisdiction over a product liability case when a large number of related cases are pending in another state; courts or litigants may wish in such circumstances to seek consolidation in the other state. Ideally, such consolidations would be coordinated under a compact among the states or by authority of federal legislation. *See, e.g.,* American Law Institute, *Complex Litigation Project,* Tentative Draft No. 3, Ch. 4 (March 31, 1992) (proposing methods of case consolidation among state courts). At present, state courts can use doctrines such as *forum non conveniens* to protect interstate comity interests by dismissing cases outright or on condition that the defendant submit to jurisdiction in a more appropriate forum.

The mass tort standard does incorporate several factors acknowledged in Supreme Court case law and by academic commentators as relevant to the constitutional-jurisdictional inquiry. They include the size and type of litigation, the relative financial condition of the parties, other burdens on plaintiff and defendant, the forum's interest in the litigation, whether the litigation will involve only two parties or several parties or indemnitors, and whether the operation of the forum's choice-of-law rules or substantive laws impose a hardship on

the defendant, favor the interests of the plaintiff, or both. *Cf.* Gottlieb, *In Search of the Link Between Due Process and Jurisdiction,* 60 Wash.U.L.Q. 1291, 1327–34 (1983) (constitutionality should turn on type of litigation and resources of parties); Redish, *Due Process, Federalism, and Personal Jurisdiction, supra,* at 1138–42 (assertion of jurisdiction that causes defendant "meaningful inconvenience" is unconstitutional unless inconvenience is outweighed by potential burdens on the plaintiff or by the forum state's interest in the litigation); Weintraub, *Due Process Limitations on the Personal Jurisdiction of State Courts: Time for a Change,* 63 Or. L.Rev. 485, 522–26 (1984) (if defendant demonstrates that assertion of jurisdiction works an unfairness, plaintiff may establish the propriety of jurisdiction "because of something that defendant has done in the forum or caused to occur in the forum").

Principle I incorporates the "interest" nexus requirement of cases like *Keeton, Burger King* and *Asahi.* By necessitating an appreciable interest, it also incorporates a proximate cause inquiry, thus imposing some limitations on the causal chain between a particular litigation and the state's interest. In keeping with current law, the burden of proving the existence of an interest is the plaintiff's.

The first principle also links jurisdictional and choice-of-law inquiries. The Supreme Court has on several occasions admonished the lower courts to treat the jurisdictional and choice-of-law inquiries as distinct. *See, e.g., Keeton,* 465 U.S. at 778, 104 S.Ct. at 1480 (" 'The issue is personal jurisdiction, not choice-of-law.' " . . . [W]e do not think that . . . choice-of-law concerns should complicate or distort the jurisdictional inquiry.") (quoting *Hanson v. Denckla,* 357 U.S. 235, 254, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)). Nevertheless, it is hard to reconcile that directive with the ongoing vitality of the sovereignty inquiry within the constitutional law of personal jurisdiction, particularly in a mass tort case. After all, a forum state's interest in any matter will normally be determined by reference to the policies expressed in its substantive laws. *See* Redish, *Due Process, Federalism, and Personal Jurisdiction, supra,* at 1139. Whether the state's substantive laws will apply to the litigation must therefore at least be relevant in determining whether or not a state interest exists that is sufficient to support an assertion of jurisdiction. *Keeton* itself treated New Hampshire's decision to encourage libel suits as germane to the jurisdictional inquiry. *See Keeton,* 465 U.S. at 775–76, 104 S.Ct. at 1478–79.

Once the choice-of-law inquiry is recognized as relevant, a question arises as to how much force it exerts. At the least, a determination that the forum state's law applies is sufficient to establish a state interest supporting a *prima facie* case for jurisdiction. *Cf.* Silberman, Shaffer v. Heitner: *The End of an Era,* 53 N.Y.U.L.Rev. 33, 88 (1978) (that choice-of-law rules favor application of law of forum state is sufficient of itself to establish personal jurisdiction). *But cf.* Stephens, *Sovereignty and Personal Jurisdiction, supra,* at 136–37 (noting that Silberman test does not give adequate attention to fairness considerations). Whether a court can and should assert jurisdiction where mass tort choice-of-law principles favor application of another forum's law—for example, where resident plaintiffs bring suit for an out-state-tort—must be left to future cases. *See* Redish, *Due Process, Federalism, and Personal Jurisdiction, supra,* at 1140–41.

After a *prima facie* case for the constitutionality of jurisdiction is made based on the court's authority to hear the case, the court must next inquire under the second principle whether the assertion of jurisdiction will be unfair to the defendant. The factors indicated in the second principle measure, among other things, the defendant's present ability to mount a reasonable defense as compared with the hardship plaintiff may suffer in having to bring its case elsewhere. The analysis will in some respects parallel the flexible analysis applied in controlling discovery under Rule 26(b)(1)(iii), *see* Part V B 3, *supra,* and in considering *forum non conveniens* motions. *See, e.g., Piper Aircraft Co. v. Rey-*

*no,* 454 U.S. 235, 249, 102 S.Ct. 252, 262, 70 L.Ed.2d 419 (1981) (hallmark of *forum non conveniens* is its flexible application to facts of each case); *see also Hodson v. A.H. Robins Co.,* 528 F.Supp. 809 (E.D.Va. 1981), (in suit by English citizens against American manufacturer and distributor of allegedly defective contraceptive device for injuries occurring in England, *forum non conveniens* motion to dismiss denied in light of public and private interests favoring trial in American forum), *aff'd,* 715 F.2d 142 (4th Cir.1983); *cf. In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in December, 1984,* 809 F.2d 195 (2d Cir.) (suit by Indian plaintiffs against American corporation for mass industrial accident in India rightly dismissed on *forum non conveniens* grounds given plaintiffs' Indian citizenship, competence of Indian courts to handle case centered on Indian regulatory law, location of evidence and witnesses and fact that plant was run exclusively by Indian citizens), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987); *Union Carbide Corp. v. Union of India,* — S.C.R. — (Sup.Ct.India Oct. 22, 1991) (upholding settlement of Bhopal claims except for that portion dismissing parallel criminal case). Since the issue is jurisdiction, however, the focus is on the particular hardships to defendant, and the showing of hardship required would be greater than that necessary to support transfer or dismissal under *forum non conveniens* doctrine.

Although the test under Principle II does not shift the burden of persuasion to defendants, the court will, as under current practice, assume fairness unless the defendant informs it of potential litigation burdens and the desirability of transfer or dismissal.

## VI. APPLICATION OF LAW TO FACTS

### A. Boehringer

#### 1. *Failure to State a Claim*

■ Stayner was merged into Boehringer under the corporations law of Delaware. Boehringer concedes that it is therefore subject to the same tort liabilities as Stayner would have been had it continued to exist. Boehringer moves to dismiss for failure to state a claim on two grounds. First it claims that *Hymowitz* prohibits suits against a company which, like Stayner, never sold DES in New York. In the alternative, Boehringer contends that, if *Hymowitz* does create a cause of action against it, comity and conflicts of law principles, as well as the Due Process and Full Faith and Credit Clauses of the federal Constitution, require the application of California rather than New York law. Under California law Boehringer would be entitled to dismissal if it could prove that it never marketed DES in plaintiffs' domicile at the time of ingestion. *See Sindell v. Abbott Labs.,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, 937, *cert. denied,* 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980).

As to the first argument, Boehringer contends that defendants who did not market DES in New York ought to be treated in the same way as *Hymowitz* treats companies that never marketed DES for pregnancy use. It argues that this reading follows naturally from the concern evidenced in *Hymowitz* and *Besser* for the protection of New York residents. Since a company that did not sell DES in New York could not have injured New York residents, the argument proceeds, *Hymowitz* could not have meant to hold such manufacturers culpable.

This argument is erroneous for two reasons. In the first place, it does not follow that, because a company did not market DES in New York, its DES could not have injured New York residents. The Court of Appeals rejected DES liability schemes that do not look to national market share for this reason. *Hymowitz,* 73 N.Y.2d at 511, 541 N.Y.S.2d 941, 539 N.E.2d 1069 (because "there are many [New York cases] in which the DES that allegedly caused injury was ingested in another state," application of less than national market share figures would place on these plaintiffs "an unfair, and perhaps impossible burden" of gathering marketing data for the region where they obtained DES). Since *proof* that a defendant did not market DES in New

York does not resolve the causation question, a cause of action under *Hymowitz* lies against all defendants that sold DES for pregnancy use anywhere in the national market. The Court of Appeals meant what it said: "there should be no exculpation of a defendant who, although a member of the market producing DES for pregnancy use, appears not to have caused a particular plaintiff's injury." *Id.* at 512, 541 N.Y.S.2d 941, 539 N.E.2d 1069.

Second, it is ironic for defendant to rests its argument for exculpation on the policy of protecting New York state residents. It is this very concern which justifies the inclusion of defendants who do not appear to have injured any state resident. The *Hymowitz* decision acknowledged that its rule would ignore the causal link between a particular defendant's acts and a particular plaintiff's harms. This departure from conventional tort law was justified as an equitable means of protecting New York residents without completely abandoning traditional notions of fairness in the apportionment of liability among defendants. The policy of protecting New York residents exposed to DES thus supports recognition of a cause of action against Boehringer.

The argument that the law of California should apply must also be rejected. Comity principles have no application to this case apart from their manifestation in New York's choice-of-law rules and, as indicated in Part IV B, those rules require the application of New York law.

■■■ The general principle of comity grants discretion to a court sitting in one state to recognize the law of another state where the application of the other state's law does not conflict with the public policy of the forum state. *See De Rose v. New Jersey Transit Rail Operations,* 165 A.D.2d 42, 565 N.Y.S.2d 305 (3d Dep't 1991). Boehringer requests application of California law as a matter of comity, yet it has already conceded a very significant New York public policy at stake in *Hymowitz* that conflicts with California law. Comity considerations therefore do not apply except insofar as they provide the conceptual basis for New York's choice-of-law rules. *See* 19 N.Y.Jur.2d *Conflicts of Laws* § 9, at 580 (1982).

For choice-of-law purposes, Boehringer is presently domiciled in Connecticut. *See Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 194, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (corporation's domicile for choice of law is location of corporate headquarters). It appears, however, that the New York Court of Appeals would treat Boehringer as domiciled in California for purposes of this action because Boehringer (through its predecessor Stayner) was domiciled in California at the time the alleged causes of action arose. *See id.* (where corporation moved from New Jersey to Texas after time of tortious acts, domicile is New Jersey). For purposes of this memorandum, the present actions against Boehringer thus involve New York plaintiffs bringing actions against a California domiciliary for injuries occurring in New York. As indicated above, both *Babcock* and *Neumeier* require that New York substantive law control such a case.

Boehringer's reliance on *Schultz* to support a contrary view is misplaced. In *Schultz,* domiciliaries of New Jersey sued corporations domiciled in New Jersey and Ohio for torts occurring in New Jersey and New York. With respect to the action by the New Jersey plaintiffs against the New Jersey defendant, *Schultz* held that *Babcock* required application of New Jersey law. *See id.* 65 N.Y.2d at 199–201, 491 N.Y.S.2d 90, 480 N.E.2d 679. With respect to the claim against the Ohio defendant, the Court of Appeals held that *Neumeier's* third principle—which covers conflicts between loss-distribution rules where the parties lack a common domicile and the tort occurred in a third state—also required application of New Jersey law, which, in contrast to New York, retained the liability-limiting concept of charitable immunity. *Schultz,* 65 N.Y.2d at 201, 491 N.Y.S.2d 90, 480 N.E.2d 679. The court reasoned that such a decision was supported by New Jersey's strong interest in retaining its immunity policy and would not frustrate New York interests because New York was

merely one locus of the tort and had "no significant interest" in the dispute.

*Schultz* thus did not involve *Neumeier's* second principle, which is the principle applicable in the instant case. Because none of the *Schultz* parties were New York domiciliaries and the tort occurred for the most part in another state, New York essentially had no interest in the suit. Where, by contrast, the suit is brought by New York residents for injuries occurring in New York, the defendant should not be allowed "to interpose the law of his state as a defense." *Neumeier*, 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454.

For reasons already discussed, Boehringer's contention that application of New York law to these plaintiffs' claims would violate the federal Constitution is equally without merit.

## 2. *Personal Jurisdiction*

Defendant Boehringer is amenable to personal jurisdiction under C.P.L.R. § 301 because it is licensed to do business here. Nevertheless, Boehringer claims that suits which seek to impose liability for the acts of Stayner Corporation can only proceed in New York if a New York court would have jurisdiction over Stayner. Because Stayner is alleged to have no contacts with New York, Boehringer claims, jurisdiction cannot be asserted in the present cases under New York law or the Due Process Clause.

As to the statutory argument, one New York court has already found that Boehringer is amenable to jurisdiction under section 301 for DES suits against it. *See Akerman v. Abbott Labs.*, Index No. 7669–90, Sup.Ct. (1st Dep't) (Aug. 21, 1991) (Gammerman, J.). The court reasoned that Boehringer, being licensed to do business in New York, has consented to general jurisdiction. It concluded that Stayner's prior relations to New York were irrelevant for jurisdictional purposes.

Justice Gammerman's analysis is persuasive. Boehringer has not pointed to any authority stating that, where a successor corporation has consented to general jurisdiction, jurisdiction for suits based on actions of its predecessor ought to be de-

termined by the predecessor's activities. There are numerous cases supporting the proposition that a court may have long-arm jurisdiction over a successor corporation with no forum contacts on the basis of the contacts of its predecessor. *See generally Simmers v. American Cyanamid Corp.*, 394 Pa.Super. 464, 576 A.2d 376 (1990) (discussing such cases), *cert. denied*, —— U.S. ——, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). Thus Boehringer would also be amenable to jurisdiction under C.P.L.R. § 302(a)(3)(ii) for the reasons that apply to Boyle. Since Boehringer has consented to general jurisdiction, however, which extends even to causes of action "not arising out of or related to the defendant's contacts with the forum," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404 (1984), jurisdiction under section 301 is appropriate. Boehringer is also amenable to general jurisdiction because it is "doing business" in New York on a systematic basis. *Simonson v. International Bank*, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 200 N.E.2d 427 (1964).

Finally, the assertion of jurisdiction under section 301 is constitutional under traditional standards and the standard for mass torts. Although the Supreme Court has not directly pronounced on the subject since 1945, the constitutionality of the traditional practice of asserting general jurisdiction solely on the basis of a corporation's being licensed to do business in the forum seems to have survived *International Shoe*. *See Burnham v. Superior Court*, 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990) (plurality opinion) (*International Shoe* did not supplant long- and widely-accepted methods of asserting jurisdiction); *Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 174–75, 60 S.Ct. 153, 157–58, 84 L.Ed. 167 (1939) (upholding New York Corporation law requiring foreign corporation to designate agent for service of process as condition of doing business); *see also Sternberg v. O'Neil*, 550 A.2d 1105, 1109–13 (Del.1988) (discussing constitutionality of general jurisdiction based on statute requiring foreign corporation to

designate agent for service of process). The constitutionality of "doing business" jurisdiction is well-established. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984).

With respect to the due process standard for mass torts, the plaintiffs have established, as required under Principle I, a *prima facie* case for the constitutionality of asserting jurisdiction under C.P.L.R. § 301. Plaintiffs' cases call for the application of New York law, in part because they are all New York domiciliaries. The *Hymowitz* and *Besser* cases, among others, indicate a clear state policy to provide full compensation to New York residents injured by ingestion of DES.

The considerations of Principle II also support a finding that jurisdiction over Boehringer may constitutionally be asserted. There is no evidence that Boehringer would suffer any hardship in mounting its defense. Under prevailing jurisdictional standards for non-mass tort cases, Boehringer in fact is required to anticipate litigation in this forum. It may therefore be required to defend these actions. If there are instances in which the application of a general jurisdiction provision like C.P.L.R. § 301 violates the due process standard for mass torts, this is surely not one of them.

## B. Boyle

■ Boyle claims never to have had any contacts with New York. It therefore concludes that the court lacks jurisdiction under C.P.L.R. § 302(a)(3)(ii) because of failure to satisfy the "injury," "causation" and "reasonable expectation" elements of that statute. Boyle also maintains that a finding of jurisdiction would violate the Due Process Clause.

Identical claims were raised by Boyle in an indemnity action brought in New York State Supreme Court. That court denied Boyle's motion to dismiss with leave to renew following further discovery. *Feit v. Emons Indus., Inc.*, Index No. 12026/81 (N.Y.Sup.Ct. Aug. 9, 1982). The motion apparently was not renewed.

### 1. *C.P.L.R. § 302(a)(3)(ii)*

It will be recalled that C.P.L.R. § 302(a)(3)(ii) provides for in personam jurisdiction over

> any non-domiciliary ... who in person or through an agent ... commits a tortious act without the state causing injury to person or property within the state ... if he ... (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

Boyle's first statutory argument is that its alleged out-of-state tortious acts caused no "injury ... within the state." As indicated in Part V A 2, this claim is contradicted by the facts. The injury-causing event in these cases was the mothers' ingestion of DES. The locus of this event was New York. As the plaintiffs exposed to DES *in utero* have been "located" in New York from the time of their exposure, the concern behind the requirement—to prevent parties from carrying their injuries back to New York—is not present.

Boyle also contends that it cannot be shown to have committed tortious acts "causing" injuries as required by section 302(a)(3)(ii). This argument, while perhaps cogent under the common law applicable to individual torts, is untenable as to mass torts controlled by *Hymowitz*. As a matter of substantive New York law, DES plaintiffs are not required to prove that a particular defendant caused their injuries. It would be counterproductive to *Hymowitz* policy to pose such a requirement as a procedural bar to their recovery. Moreover, for reasons discussed above, these defendants cannot presume that they did not cause injuries in New York. Some plaintiffs may have obtained DES outside New York and ingested it in New York.

Finally, relying on the New York "stream of commerce" cases, Boyle claims that it could not reasonably have expected its alleged tortious acts to have forum consequences. As pointed out in Part V A 2, however, those cases are inapposite because they involve traditional, single plaintiff tort actions. Boyle was a participant in

the national DES market whose alleged harms have affected thousands of persons across the nation. Under *Hymowitz*, the fact that its actions would have consequences for the marketing of DES in every state was reasonably foreseeable.

### 2. Due Process

Boyle has presented evidence indicating that (1) it has no "contacts" with New York in the traditional sense; (2) although it was engaged in substantial interstate commerce during much of the period when DES was marketed, its revenues have dropped precipitously in recent years to the point where the company is essentially inoperative; and (3) Boyle's share of the national DES market in any given year was fairly small— somewhat less than 0.5%. For these reasons, it maintains that it cannot constitutionally be brought into New York court on DES product liability claims.

Under the standard for mass torts articulated in Part V B 4, inquiry into the defendants' territorial contacts with the forum takes the form of an inquiry into the forum state's interest in the litigation and the defendant's relative ability to mount a defense in the forum without undergoing substantial hardship.

As indicated in the application of the mass tort standard to Boehringer, plaintiffs have established New York's interest in the litigation and with it a *prima facie* case for the constitutionality of asserting jurisdiction over these defendants. There remains, then, only the considerations grouped under the second principle of the standard for mass torts.

█ Boyle's past interstate activity certainly satisfies the statutory requirement of deriving "substantial revenue" from interstate commerce. This is because the New York statute essentially treats the substantial revenue element as a branch of the "reasonable expectation" inquiry: evidence of interstate commercial activity supports the inference that the defendant expected its conduct to have effects in New York. *See, e.g., Path Instruments Int'l Corp. v. Asahi Optical Co.*, 312 F.Supp. 805, 810 (S.D.N.Y.1970). A defendant's

reasonable expectations, however, are not at issue in the modified due process fairness inquiry applicable to DES cases. Rather, the inquiry is whether the defendant can mount a reasonable defense in this forum without undergoing substantial hardship.

While an important consideration, Boyle's revenue figures do not of themselves demonstrate that it will face undue hardship in presenting its defense. There is no indication that the company is in danger of insolvency. It may, in fact, have substantial assets. The revenue figures indicate only that the company is conducting minimal new business.

In presenting its defense, Boyle continues to benefit from economies of scale, a feature of mass tort litigation noted earlier. For pre-trial motions including this one, Boyle has properly joined in the motions of other defendants rather than submitting duplicative papers. At trial a central issue for all of the defendants will be market share. Boyle will in all likelihood not present evidence on any other issue and will rely on counsel for co-defendants to handle other matters. The situation is in this respect akin to a case in which an indemnitor defends on behalf of a defendant. Moreover, as already noted, most corporate defendants' litigation costs are paid by national or international insurance companies. There is no indication here that insurance coverage has been exhausted.

The existence of a small market share has no obvious bearing on whether Boyle will be burdened in defending this suit. It does figure in the determination of the relative harm to plaintiffs that a dismissal or transfer will cause. Although under joint and several liability, Boyle's departure from the case would have no adverse effect on plaintiffs, the *Hymowitz* court's decision to impose several liability specifically links plaintiffs' recoveries to the ability to obtain jurisdiction over defendants. Accordingly, the New York Court of Appeals developed a substantive liability scheme that maximizes the number of potentially liable defendants. *Hymowitz* thus regards

the dismissal of even "small players" as a significant harm to DES plaintiffs. Boyle's share, moreover, was not as insubstantial as the figures may first suggest. Preliminary market share figures indicate that, for any year between 1949 and 1971, the vast majority of the DES market was supplied by a handful of the hundreds of DES manufacturers. Boyle's market share was on a par with that of scores of co-defendants. The Court of Appeals did not envision New York residents roaming about the country seeking redress from dozens of smaller defendants in their home states.

While it is evident that plaintiffs will suffer harm from Boyle's exclusion, there is no evidence before the court that Boyle will suffer any undue hardship from defending this suit in New York. In the absence of an indication that the defendant is without adequate resources, there is no basis for concluding that defendant will be excessively burdened by a New York trial and, *a fortiori*, no reason to believe that defendant's burden will exceed the burden on plaintiffs of a dismissal. The assertion of jurisdiction under C.P.L.R. § 302(a)(3)(ii) therefore does not offend due process.

## VII. CONCLUSION

With respect to plaintiffs Angela Silveri, Deborah Ashley, Andrew Ashley, Marjorie Berger, Ann Danoff, Christopher Wang, Maureen Kent, Steven Kass, Nancy Kirsch, Steven Kirsch, Carol Rosenthal, Barry Rosenthal, Eva Zweifler, Vincent Alvarado, Gail Buckman, Michael Sklaroff, Robin Edwards and Frank J. Edwards, defendant Boehringer's motions to dismiss for failure to state a claim and for lack of personal jurisdiction are denied. With respect to these plaintiffs, Defendant Boyle's motion to dismiss for lack of personal jurisdiction is also denied.

So ordered.